ALBERT A. LAZISKY AND ELIZABETH LAZISKY, PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MAGNOLIA SURF, INC., PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 11004–76, 170–77.     Filed June 14, 1979.

*Joseph C. Cortellino* and *Eugene D. Bernstein,* for the petitioners in docket No. 11004–76.

*Charles Demakis,* for the petitioner in docket No. 170–77.
*James A. Boyce,* for the respondent.

STERRETT, *Judge:* In a notice of deficiency dated October 4, 1976, respondent determined a deficiency in income taxes paid by petitioners Albert A. Lazisky and Elizabeth Lazisky, docket No. 11004–76, for their taxable year ended December 31, 1971, in the amount of $30,724.52. In a notice of deficiency dated October 4, 1976, respondent determined deficiencies in income taxes paid by petitioner Magnolia Surf, Inc., docket No. 170–77, for its taxable years ended March 31, 1972 and 1974, in the respective amounts of $8,113 and $2,517.75. After concessions the only remaining issues for our decision are (1) the proper allocation of the sales price of a business between goodwill and a covenant not to compete, and (2) whether or not petitioner Magnolia Surf, Inc., is entitled to a certain investment tax credit.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Albert A. and Elizabeth Lazisky, petitioners in docket No. 11004–76, are husband and wife. They filed their joint Federal income tax return for their taxable year ended December 31, 1971, with the Director, Internal Revenue Service Center, Andover, Mass. At the time their petition was filed herein, they resided in Manchester, Mass. Petitioners in docket No. 11004–76 shall be hereinafter referred to as the Laziskys. Petitioner Albert A. Lazisky shall be referred to as Lazisky.

Magnolia Surf, Inc. (New Surf), petitioner in docket No. 170–77, is a corporation engaged in the restaurant business. New Surf was incorporated under the laws of the State of Massachusetts on March 11, 1971. At the time its petition herein was filed, New Surf's principle office was located in Manchester, Mass. New Surf filed its Federal income tax returns for its taxable years ended March 31, 1972, through March 31, 1974, with the

---

[1] We note that petitioners in docket No. 11004–76 have not contested any of respondent's proposed adjustments as enumerated in his statutory notice of deficiency except those relating to the question of whether or not they had received $65,000 as ordinary income in respect of the covenant not to compete. Petitioners in docket No. 11004–76 are, therefore, deemed to have conceded these other adjustments to the extent that they do not involve the covenant not to compete issue.

Director, Internal Revenue Service Center, Andover, Mass. At all times relevant hereto, all New Surf's issued and outstanding stock was owned by Christopher Sabanty (Sabanty).

Magnolia Surf, Inc. (Old Surf), is a liquidated Massachusetts corporation which had engaged in the restaurant business, operating The Surf restaurant in Manchester, Mass. All Old Surf's issued and outstanding stock had been owned at all times relevant hereto by the Laziskys. The Laziskys had purchased The Surf restaurant in 1956 for $28,000. At that time the restaurant grossed approximately $50,000 to $70,000 per year. By the time the Laziskys sold The Surf in 1971, it was grossing approximately $750,000 a year and could seat approximately 457 people. This growth was due to a combination of many factors: good food, service, prices, and atmosphere; a good location on the shore near two main highways leading to Gloucester, Mass.; and a well-known name. The Surf did very little advertising during Lazisky's tenure there, relying primarily on word of mouth to bring in customers.

Ownership of The Surf's business and assets under the Laziskys was divided between Old Surf and the Laziskys. The Laziskys owned the land and buildings occupied by The Surf. Old Surf, in turn, owned all the remaining assets of the business including the intangible personal properties used in connection with the restaurant business: the name "The Surf" and the business and goodwill of the restaurant.

During all The Surf's years of growth Lazisky worked, not only as president of the corporation, but also as a chef in the restaurant kitchen. In 1967 and again in 1969, at the ages of approximately 43 and 45, Lazisky had heart attacks. After his last heart attack, Lazisky was advised by his physician to sell The Surf and retire from the restaurant business. Immediately after his release from the hospital following this last heart attack, Lazisky put The Surf up for sale. Serious negotiations between Lazisky and Sabanty for the sale of The Surf did not begin, however, until 1971.

The negotiations leading up to the sale agreement were conducted in an informal manner. The prime concern of both Sabanty and Lazisky, who represented both himself and Old Surf, was to establish an agreed upon sales price. This they set at $427,000. Having done this, the two principals turned the detail work of finalizing the agreement over to their respective

attorneys and other representatives. At no time during these negotiations did either principal discuss the allocation of any of the sales price to the covenant not to compete.

The product of all these negotiations was the Purchase and Sale Agreement (agreement) entered into by the parties on February 24, 1971. The agreement was between Old Surf, the Laziskys, and Sabanty. In it Sabanty agreed to purchase all the assets of Old Surf, plus the real estate owned by the Laziskys. Part 1 of the agreement said in relevant part:

1. *Sale of Certain Assets:* The SELLERS agree to sell and the BUYER agrees to buy the following:

(a) REAL ESTATE: The land with the buildings thereon belonging to the said Albert A. Lazisky and Elizabeth Lazisky * * *.

(b) PERSONAL PROPERTY: All tangible property now owned by MAG-NOLIA SURF, INC. and used or usable in connection with said restaurant * * *.

(c) The BUYER shall be given all rights of the SELLERS in and to the use of the name, THE SURF, and its business and Good-Will.

Included in the list of assets sold to Sabanty were all Old Surf's customer lists and lists of reservations, employee lists, and all relevant licenses.

Part 3 of the agreement was labeled "PURCHASE PRICE." In this part Sabanty agreed to pay the sellers as follows: (1) $20,000 upon signing the agreement; (2) $347,000 upon delivery of the appropriate deed and bill of sale; and (3) $60,000 by way of a note from Sabanty bearing 9.5-percent interest payable with 5 years in monthly installments of $1,260.20, secured by a mortgage on the real estate and a chattel mortgage on the personalty transferred under the agreement. Part 3 of the agreement also contained a comminution of the sales prices as follows:

(4) Said sum [the total sales price] represents the aggregate of the sums to be paid for the properties to be conveyed and transferred as follows:

| | |
|---|---|
| Real Estate | $175,000 |
| Furniture, fixtures and equipment | 170,000 |
| Inventory | 15,000 |
| Name, business and Good-Will | 67,000 |
| | [2]427,000 |

---

[2]This $427,000 figure does not include any amount with respect to Old Surf's inventory of food, liquors, and supplies.

Part 5 of the agreement, entitled "COVENANTS OF SELL-ERS," provided as follows:

(c) The Bill of Sale to be delivered at the closing will contain the restrictive covenant by which the said Albert A. Lazisky and Elizabeth Lazisky will agree to the following:

(1) Not to engage in the restaurant business, either directly or indirectly, as owners, partners, stockholders, employees, or otherwise for a period of five (5) years within a radius of twenty (20) miles from the location of the present "THE SURF" * * *

Finally, part 14 of the agreement contained an agreement between the parties under which Sabanty agreed to employ both Laziskys at $200 per person per week from the closing date until June 1, 1971. The Laziskys in turn agreed to "assist the BUYER to June 1, 1971 by remaining in their present posts and performing their present duties * * * it being understood that the said Albert A. Lazisky is in poor health and is unable to work a full day."

A copy of the bill of sale, dated April 1, 1971, was included in the record. The bill of sale incorporated the agreement's covenant not to compete by reference. Old Surf was liquidated and all its assets distributed to the Laziskys within the calendar year 1971. At no time have the Laziskys included any amount in their income as consideration received in exchange for their covenant not to compete.

The agreement anticipated that Sabanty would form at least one new corporation to be named Magnolia Surf, Inc. (New Surf). In fact two new Massachusetts corporations were subsequently formed, i.e., New Surf and Sabanty Realty Corp. Both these entities were incorporated in March of 1971 with Sabanty being the sole stockholder of each. Sabanty Realty Corp. was formed to hold the real estate purchased from the Laziskys. New Surf was formed to hold the restaurant business itself. On both its returns for its taxable years ended March 31, 1972 and 1974, New Surf allocated $65,000 of the $67,000 Sabanty paid for Old Surf's "Name, business and Good-Will" to the Laziskys' covenant not to compete. Amortizing this $65,000 over the covenant's 5-year useful life, New Surf deducted $13,000 in its taxable year ended March 31, 1972, and $12,799.92 in its taxable year ended March 31, 1974. The Laziskys have conceded respondent's determination that if the $65,000 was not ordinary income to

them, it was includable in their income as a distribution in liquidation of Old Surf.

In January 1975, Sabanty and his attorneys approached Lazisky to request his consent to the ¡correction! of a so-called "mistake" in the agreement with respect to how the covenant not to compete was treated. Lazisky refused to alter the agreement because, in his view, it already reflected his intention with respect to the treatment of the covenant.

## OPINION

This is another in a long line of cases involving the proper allocation of a business' sales price between goodwill and a covenant not to compete. The tax stakes are obvious and well settled. If an amount is paid for a covenant not to compete, then the payment generates an intangible asset of value to the covenantee in his business for a definitely fixed period of time. Such an asset is clearly amortizable over its life. Sec. 1.167(a)–3, Income Tax Regs. The covenantor, on the other hand, is deemed to have received an amount in respect of his agreement not to perform services—which is ordinary income includable in his income upon receipt.

Goodwill is a capital asset which, conventional wisdom tells us, does not waste. Thus, its purchase is a nonamortizable capital investment-and its sale generates capital gain.

This simple statement of the law belies the great body of litigation revolving around the question of whether, in any particular case, a proper, or at least tax-enforceable, allocation between a covenant not to compete (covenant) and goodwill has been made. The reports are replete with cases in which one or both parties have resorted to the courts in their effort to be held to a contract other than the one they made, or prove the contract that they would have made had they thought of it.

The courts have reacted in a predictable fashion to this flood of litigation. Pulled in opposite directions by two powerful axioms of law, (1) that a person should be free to contract and that, once made, contracts should be enforced as made (absent certain enumerated exceptions), and (2) that in the tax law, substance must prevail over form, the courts have tended to base their decisions on theories incorporating elements of both these principles. Equally predictable has been the distribution of opinions along a continuum according to the emphasis given any

one of these principles in the various jurisdictions. Thus, the so-called *"Danielson* rule" of the Third Circuit tends to emphasize form. Yet the rule in that circuit also provides for the court's right to look to the substance of the transaction in certain situations:

a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. [*Commissioner v. Danielson*, 378 F.2d 771, 775 (3d Cir. 1967).]

On the other side of the continuum are such cases as *Wilson Athletic Goods Mfg. Co. v. Commissioner*, 222 F.2d 355 (7th Cir. 1955). In that case the parties had failed to provide a specific allocation of part of the purchase price to the covenants—which clearly possessed some value. The Seventh Circuit, using purely substance over form reasoning, reversed our holding that the covenant was nonseverable from the goodwill and that, therefore, no amortizable deduction was allowable saying:

But in tax matters we are not bound by the strict terms of the agreement; we must examine the circumstances to determine the actualities and may sustain or disregard the effect of a written provision or of an omission of a provision, if to do so best serves the purpose of the tax statute. * * * Therefore, it was the duty of the tax court and is our duty here to ascertain the true intent, insofar as tax consequences are concerned. Consequently, it is immaterial whether the contract did or did not define a specified amount as the value of the covenant. * * * In view of the silence of the contract in this respect, it became necessary to determine then from the other evidence whether the covenant had a value, and if so the amount thereof. Where realistically and actually the covenant has a discernible value, the purchaser, of course, may amortize the price paid for it and claim annual deductions pro rata during the life of the covenant. [*Wilson Athletic Goods Mfg. Co. v. Commissioner, supra* at 357.]

The rule in this Court has tended to fall somewhat between rules of these two cases. In general we prefer to apply the so-called "strong-proof" rule—or more precisely the "economic significance" or "economic reality" version of strong proof as that rule is stated in the oft-cited case of *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960):

we think that the covenant must have some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement. [*Schulz v. Commissioner*, 294 F.2d at 55.]

Our test is designed to (1) produce predictability (and therefore

reduce litigation) by generally enforcing agreements as made, and (2) assure at the same time that the Court is not hamstrung into enforcing obviously substanceless allocations.

The First Circuit, to which an appeal in this case would normally lie, has adopted its own version of "strong proof." See *Leslie S. Ray Insurance Agency, Inc. v. United States*, 463 F.2d 210 (1st Cir. 1972); *Harvey Radio Laboratories, Inc. v. Commissioner*, 470 F.2d 118 (1st Cir. 1972), affg. a Memorandum Opinion of this Court.[3] In *Harvey Radio* the First Circuit explained its version of strong proof as follows:

our belief is that the "economic reality" rule is not appropriate, and that *Leslie Ray* states the correct test. *Leslie Ray* states a rule of intention. If the parties to a sale have affirmatively agreed to an allocation, they should not be able to state, later, to the Commissioner, that their agreement was meaningless. [*Harvey Radio Laboratories, Inc. v. Commissioner, supra* at 119–120.]

We have bound ourselves to apply this "rule of intention" to the case before us. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

We interpret the First Circuit's strong-proof/intent rule as leaning more heavily on form than does our economic significance standard, but not so much as the Third Circuit's *Danielson* rule. We believe that the First Circuit would ask only whether the agreement as drawn truly represented the intention of the parties at the time it was signed—not whether that intention itself conforms with "economic reality."[4] This standard is very close to the *Danielson* standard because the primary ways in which a party can challenge his intent with respect to a sales agreement is to plead fraud, undue influence, duress, or mutual mistake—all contract defenses that go to the original existence of a contractual intent.

On the facts before us we have no difficulty in concluding that the parties intended to make exactly the agreement they did and no other. We conclude, therefore, that New Surf has failed to adduce strong proof that the parties' intent was other than is shown in their agreement. Our conclusion does not mean that we believe that the covenant was not bargained for or that it had no value. We hold rather that within the First Circuit, these other factors are not determinative in our inquiry with respect to

[3]*Harvey Radio Laboratories, Inc. v. Commissioner*, T.C. Memo. 1972–85.
[4]See *Danehy v. Commissioner*, T.C. Memo. 1974–281.

intent. We hold that it was the intent of the parties to the agreement to allocate none of the purchase price to the covenant.

In this connection we believe the following facts are important. First, the $67,000 at issue herein was paid to the corporation, not to the Laziskys. The amount was paid for the corporation's "Name, business and Good-Will." Since the money was paid to the corporation it must have been paid for something the corporation owned. The corporation did not own a right to Lazisky's services for 5 years into the future. In this connection we reject New Surf's request that we interpret "business" to include the Laziskys' covenant not to compete. We read "business" to be in para materia with "name" and "goodwill." We believe that when the parties used the word "business" in conjunction with "name" and "goodwill" they were referring to The Surf's going-concern value. Going-concern value is, of course, a valuable property right.

Second, we note that all parties were represented by experienced counsel. Presumably counsel would have allocated part of the purchase price to the covenant if they so intended. Yet, they did not. Instead, they inserted what New Surf has emphasized was a long and detailed covenant into a part of the agreement totally separate from the asset allocation sections.

Third, we note the importance attached to the covenant by the purchaser. At the trial herein, Sabanty testified that he would not have purchased The Surf if he had not received Lazisky's covenant not to compete. Obviously an element so important to the purchaser would not be haphazardly dealt with in the purchase contract.

Fourth, we find of some importance the fact that it was Sabanty's attorneys who contacted Lazisky after the last payment on Sabanty's $60,000 note was made, over 5 years after the purchase date, to ask Lazisky for his consent to an amendment to the agreement allocating part of the purchase price to the covenant. Obviously such a move would not have been necessary if Sabanty had believed the contract already made such an allocation.

Finally, and most importantly, we note that there was never any discussion about allocating any part of the purchase price to the covenant not to compete and that the agreement itself assigns no value to the covenant. These considerations lead us

almost necessarily to the conclusion that no such allocation was intended. See *Annabelle Candy Co. v. Commissioner*, 314 F.2d 1, 7 (9th Cir. 1962).

In sum, we hold that New Surf has failed to show by strong proof that the parties intended any allocation other than that contained in the agreement itself. At best, the evidence shows that the parties had no intention at all with respect to the allocation of any of the purchase price to the covenant. In either case, the contract must be enforced as made. We find that none of the $67,000 paid for "Name, business and Good-Will" was paid for the covenant.[5]

The final issue with which we must deal involves New Surf's claimed investment credit. This claim is based on its purchase from Old Surf of all that corporation's "furniture, fixtures and equipment" to which the agreement allocated $170,000. New Surf alleges, and respondent concedes, that all the personalty purchased had remaining useful lives of 7 years as of the purchase date. New Surf's "qualified investment" in the personalty is, therefore, equal to 100 percent of the property's cost (sec. 46(c)(1)(B) and (c)(2)), subject to the $50,000 limitation contained in section 48(c)(1). New Surf's claimed investment tax credit is, thus, 7 percent of $50,000. Sec. 46(a)(1).

The controversy with respect to the investment issues relates to provisions of section 50(a)(2), and primarily the proper interpretation of the word "order" as it was used in section 50:

SEC. 50. RESTORATION OF CREDIT.

(a) GENERAL RULE.—Section 49(a) (relating to termination of credit) shall not apply to property—

\*     \*     \*     \*     \*     \*     \*

(2) which is acquired by the taxpayer—

\*     \*     \*     \*     \*     \*     \*

(B) after March 31, 1971, and before August 16, 1971, pursuant to an order which the taxpayer establishes was placed after March 31, 1971.

Preliminarily, New Surf argues, and respondent concedes, that its section 50 "acquisition" of the personalty occurred after March 31, 1971, i.e., that acquisition occurred on April 1, 1971, when the bill of sale was delivered and title to the personalty transferred. New Surf then goes on to argue that there was no "order" for the goods before March 31, 1971, because neither it nor Sabanty, its predecessor in interest, had made "an outright

---

[5]For cases reaching the same conclusion on similar facts see *Lucas v. Commissioner*, 58 T.C. 1022 (1972); *Rich Hill Insurance Agency, Inc. v. Commissioner*, 58 T.C. 610 (1972).

commitment to purchase the asset" on or before that date and an "order" requires such a commitment. Armed with this definition of "order," New Surf goes on to argue that the agreement of February 24, 1971, i.e., the only other writing executed before March 31, 1971, was not an "order" because it was subject to several conditions, such as Sabanty's obtaining adequate mortgage financing. Implicit in New Surf's argument is the claim that no "order" is necessary to the successful application of section 50(a)(2)(B). In New Surf's view, section 50(a)(2)(B) requires only that *if* an order was placed, it must have been placed after March 31, 1971.

Respondent argues that the requirements of section 50(a)(2)(B) are twofold: (1) That an "order" be placed for the goods after March 31, 1971, and (2) that the acquisition of the goods occur after the "order" and before August 16, 1971. He then goes on to argue that the word "order" as used in section 50 was used in its normal commercial sense to mean "offer." Since the agreement of February 24, 1971, was not an offer but a contract of sale, the "offer" required by section 50(a)(2)(B) must have occurred before February 24, 1971. Thus, petitioner's claim must fail.

We agree with respondent. While the word "order" is not defined in section 50 or its regulations, we do not believe that Congress intended any meaning for that word other than that ascribed to it in normal commercial practice. Thus, an "order" is something in the nature of an offer which may be accepted in the several ways described in article 2 of the Uniform Commercial Code. See U.C.C. sec. 2–206(1)(b); see also *Menendez v. Faber, Coe & Gregg, Inc.*, 345 F. Supp. 527, 563 (S.D. N.Y. 1972), modified on other grounds sub nom. *Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir. 1973), revd. sub nom. *Alfred Dunhill of London, Inc. v. Republic of Cuba, et al.*, 425 U.S. 682 (1976).

The agreement of February 24, 1971, was certainly more than an "offer." It was an actual contract subject to certain conditions subsequent which conditions did not, of course, invalidate the contract itself. Since the goods at issue were acquired on April 1, 1971, pursuant to a contract made on February 24, 1971,

it is reasonable to assume that the "order," therefore, must have been placed before March 31, 1971.

> *Decision will be entered under Rule 155 in docket No. 11004-76.*

> *Decision will be entered for respondent in docket No. 170-77.*