PETERSON MACHINE TOOL, INC., AND ITS SUBSIDIARY, KANSAS INSTRUMENTS, INCORPORATED, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 8607–80, 8980–80—8982–80.     Filed July 14, 1982.

---

[1]Cases of the following petitioners are consolidated herewith: M. V. Welch and Lucy L. Welch, docket No. 8980–80; Robert W. Moses and Dixie L. Moses, docket No. 8981–80; and Carl U. Hansen and Merida Hansen, docket No. 8982–80.

*Merrill R. Talpers, Glenn E. Bradford,* and *Ronald S. Bronstein,* for the petitioners in docket No. 8607–80.

*Laurin W. Schutter,* for the petitioners in docket Nos. 8980–80, 8981–80, and 8982–80.

*James E. Cannon,* for the respondent.

FORRESTER, *Judge:* In these consolidated cases, respondent has determined deficiencies in petitioners' Federal income taxes as follows:

| Petitioner | Docket No. | Year ending | Deficiency |
|---|---|---|---|
| Peterson Machine Tool, Inc., | 8607–80 | 8/31/76 | $22,997.00 |
| and its subsidiary, | | 8/31/77 | 11,154.00 |
| Kansas Instruments, Inc. | | | |
| Carl U. Hansen | 8982–80 | 12/31/75 | 17,950.00 |
| and Merida Hansen | | | |
| M. V. Welch | 8980–80 | 12/31/75 | 3,140.65 |
| and Lucy L. Welch | | | |
| Robert W. Moses | 8981–80 | 12/31/75 | 2,515.00 |
| and Dixie L. Moses | | | |

Concessions having been made, the only issue remaining for decision is whether any portion of the sale price of all of the corporate stock of Kansas Instruments, Inc., is properly allocable to covenants not to compete.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Peterson Machine Tool, Inc. (hereinafter referred to as Peterson, Inc.), is a Missouri corporation with its principal place of business, at the time its petition herein was filed, in Shawnee Mission, Kans. It filed U.S. Corporation Income Tax

Returns (Forms 1120) for the fiscal years ending August 31, 1976, and 1977, with the Internal Revenue Service Center in Austin, Tex.[2]

The individual petitioners in each docket number are husbands and wives who, at the time their petitions herein were filed, resided in the State of Kansas. They timely filed their joint Federal income tax returns for 1975 with the Internal Revenue Service Center in Austin, Tex.

Peterson, Inc., has been engaged in the business of manufacturing and distributing equipment for the automobile engine rebuilding and reconditioning field since 1962. It also purchases certain products for resale in this field, particularly cleaning equipment. Peterson, Inc.'s president and controlling stockholder is D. R. Peterson (hereinafter Peterson).

Kansas Instruments, Inc. (hereinafter Instruments), is a Kansas corporation engaged in the manufacture, distribution, and sale of cleaning tanks and automobile rebuilding equipment.

In 1969, Carl U. Hansen (hereinafter sometimes referred to as Hansen), a 59-year-old graduate mechanical and industrial engineer, purchased one-ninth of the stock of Instruments.[3] By 1971, most of the other owners of Instruments had been bought out by Hansen. With his technical expertise, Hansen assisted Instruments in various ways, including the design of its product line. He was never, however, a paid employee of Instruments.

In 1970 or 1971, Robert W. Moses (hereinafter sometimes referred to as Moses), a graduate industrial engineer, who was then 1 year out of college, began to work for Instruments. He soon became its general manager, and was largely responsible for new products and improvements in old ones.

By 1975, Instruments had gained significantly in financial success, having gone from a loss of approximately $8,500 in 1971 to a profit of approximately $30,000 in 1974. As of that time, Moses owned 18 percent of the stock of Instruments. He had primary knowledge and responsibility regarding design,

---

[2]On Nov. 20, 1979, Peterson, Inc., filed amended returns (Forms 1120X) for the fiscal years in issue.

[3]Hansen was, from 1957 through 1976, a full-time teacher in the industrial engineering department at Kansas State University.

development, and function of Instruments' product line, its labor force, marketing and sales force, and its customer relations. He spent 40 to 60 hours per week on that corporation's affairs.

At this time Hansen, then 65 years of age and owner of 71 percent of Instruments' stock, was only marginally involved in Instruments. While he was generally aware of the corporation's activities, and fully capable of performing any of the tasks of general manager, he usually went into the office only 1 day each week, and then only for 2 to 4 hours. Only rarely did he involve himself in customer relations and product concerns. He never received a salary from Instruments, nor did that corporation ever pay any dividends while he was a shareholder.

In addition to Hansen and Moses, during 1975 there was a third shareholder in Instruments—M. V. Welch (hereinafter sometimes referred to as Welch). Welch owned 11 percent of that corporation's stock, but was not actively involved in its operations. He was 66 years of age and president and controlling stockholder of Welch Manufacturing Corp. Although Welch Manufacturing Corp. did not produce the same type of equipment as did Instruments, the machinery and tools used in its manufacturing processes were substantially similar to those used by Instruments in its business. Welch retired from active participation in his corporation in 1978.

In early 1975, Peterson, Inc., first began to do business with Instruments. Peterson went to the latter's place of business and saw that it could make a cleaning tank needed in Peterson, Inc.'s product line. A few such tanks were ordered and delivered. Hansen and Moses delivered the products to Peterson, Inc., personally. Peterson, Hansen, and Moses then went to lunch, at which time Peterson asked Hansen if he would consider selling Instruments. Hansen's reply was "I'm not interested in selling it at the present time."

Peterson's interest in acquiring Instruments stemmed from the fact that that corporation manufactured a revolutionary dishwasher-type cleaning machine which was then the only one of its kind in the United States and which was in great demand. Additionally, Instruments was a major competitor of Peterson, Inc., with regard to other products. Peterson be-

lieved that the product lines of both companies would compliment each other, increasing sales of both.

Approximately 6 weeks after Peterson's first inquiry into the purchase of Instruments, Hansen called Peterson on the phone to inform him of his interest in selling all of Instruments' stock for $280,000. Hansen's change of heart was a result of his age (65 years), his relative inactivity at the business, and his desire to retire and travel. Hansen had previously discussed the sale with Welch and Moses, who agreed to go along with Hansen's decision to sell all of Instruments' stock for $280,000.

Negotiations ensued between Hansen and Peterson, lasting from approximately June 1975 through October 1975. The primary issue throughout the negotiations was price. Peterson made offers of $100,000, $150,000, and $250,000, each of which was rejected by Hansen, who would not waiver from his original price of $280,000. Peterson's increasing offers were made notwithstanding advice from the bank where Peterson, Inc., maintained a $650,000 line of credit, that Instruments was worth only $100,000 and, in the most favorable light, possibly as high as $180,000. This conclusion was based on book value ($90,000) and earnings ($30,000 in 1974) as shown on Instruments' financial statements for 1971 through 1974, and for the first 7 months of 1975.

Finally, on October 29, 1975, Peterson agreed to Hansen's price of $280,000 because of his belief that the corporations would compliment each other so well. Based solely on Peterson, Inc.'s good credit, and not on Instruments' credit or its assets, the bank agreed to increase Peterson, Inc.'s line of credit to $750,000, and to loan that corporation the money to purchase Instruments' stock.

At the meeting between Peterson and Hansen on October 29, 1975, the former agreed to pay $280,000 for Instruments' stock, and the parties shook hands on it. Prior to that handshake, there had been no discussion of a covenant not to compete as part of the transaction, but almost immediately thereafter (within 2 or 3 minutes), Peterson said "we want a covenant not to compete" and Hansen replied "we will give you one." Shortly thereafter Hansen told Moses that Peterson wanted a covenant not to compete and an employment contract from Moses, to which Moses agreed.

On or about November 24, 1975, Peterson, Inc.'s accountants submitted a list of representations for verification to Instruments, and Hansen signed the list as president of Instruments. This instrument also confirmed the agreement reached between the parties:

15. An agreement was reached on October 29, 1975, for the Company to sell all of the issued and outstanding corporate shares of Kansas Instruments, Inc., for $280,000. The final closing will be December 11, 1975. If the purchase is consummated on this date, it will be effective as of the close of business on October 31, 1975.

On December 4, 1975, Hansen, Moses, and Welch (sometimes hereinafter collectively referred to as the sellers) met with Peterson, Merrill R. Talpers (Peterson, Inc.'s attorney—a tax specialist—hereinafter referred to as Talpers), and Robert C. Anderson (Peterson, Inc.'s accountant, hereinafter referred to as Anderson) in the office of the sellers' attorney, David Heilman (hereinafter Heilman). To that meeting, Talpers brought several copies of a draft contract of sale for review by all of the persons involved. The draft was read by the sellers, discussed in private with Heilman, and changes were made. This draft included, inter alia, the following paragraphs:

IT IS THEREFORE AGREED:

1. *Sale of corporate shares.* For the total purchase price of $280,000.00, each of the Sellers shall (1) sell to the Buyer the number of shares of the Company set forth below opposite his name effective the close of business on October 31, 1975, and (2) execute the covenant not to compete as set forth in numbered paragraph 11 of this Agreement:

| *Seller* | *Shares to be sold* |
|---|---|
| Carl U. Hansen | 1,495 |
| Robert W. Moses | 385 |
| Bud Welch | 240 |

and the Buyer, in reliance on the representations, covenants and warranties of the Sellers contained herein and subject to the terms and conditions of this agreement, shall purchase such shares from the Sellers, respectively, at such purchase price.

\*       \*       \*       \*       \*       \*       \*

11. *Covenants not to compete.* Each Seller agrees to execute a covenant not to compete which will state that, from and after the closing, he will not, unless acting as an officer or employee of the Company, or with the Buyer's prior written consent, directly or indirectly own, manage, operate, join, control, or participate in, or be connected as an officer, employee, partner, or otherwise with, any business under any name similar to the Company's

name, and that, for a period of five years after the closing, he will not in any such manner directly or indirectly compete with, or become interested in any competitor of, the Company. The Sellers acknowledge that the remedy at law for any breach by either of them of such covenants not to compete will be inadequate, and that the Company and the Buyer shall be entitled to injunctive relief. It is the intention of the Sellers and the Buyer that the execution of these covenants not to compete be considered as materially significant and essential to the closing as set forth in numbered paragraph 2 of this Agreement and that such covenants are a material portion of the purchase price set forth hereinabove.

The above paragraphs were both read and understood by the sellers; however, no specific discussion of them took place. Heilman's copy of the draft indicated that the sellers had no questions regarding the covenant not to compete language and that they did not disagree with the provisions.

On December 11, 1975, Peterson, for Peterson, Inc., and the sellers closed the transaction, signing the final revised contract, and money changed hands. The revised contract, in relevant part, provided:

IT IS THEREFORE AGREED:

1. *Sale of corporate shares.* For the total purchase price of $280,000.00, each of the Sellers shall (1) sell to the Buyer the number of shares of the Company set forth below opposite his name effective the close of business on October 31, 1975, and (2) execute the covenant not to compete as set forth in numbered paragraph 12 of this Agreement:

| *Seller* | *Shares to be sold* |
| --- | --- |
| Carl U. Hansen | 1,495 |
| Robert W. Moses | 835 |
| M. V. Welch | 240 |

and the buyer, in reliance on the representations, covenants and warranties of the Sellers contained herein and subject to the terms and conditions of this agreement, shall purchase such shares from the Sellers, respectively, at such purchase price.

\*     \*     \*     \*     \*     \*     \*

12. *Covenants not to compete.* Each Seller agrees to execute a covenant not to compete which will state that, from and after the closing, he will not, unless acting as an officer or employee of the Company, or with the Buyer's prior written consent, directly or indirectly own, manage, operate, join, control, or participate in, or be connected as an officer, employee, partner, or otherwise with, any business directly or indirectly which competes with the products, or otherwise with the Company for a period of five years after the closing. The Sellers acknowledge that the remedy at law for any breach by either of them of such covenants not to compete will be inadequate, and that the Company and the Buyer shall be entitled to injunctive relief. It is the intention of the Sellers and the Buyer that the execution of these covenants

not to compete be considered as materially significant and essential to the closing as set forth in numbered paragraph 2 of this Agreement and that such covenants are a material portion of the purchase price set forth hereinabove.

Also, on that date, each of the sellers signed a separate covenant not to compete which referred to paragraph 12 of the contract. Its provisions were almost identical to those of the sale contract.[4]

At no time from the commencement of negotiations through the closing of the contract of sale were there discussions regarding any allocations of specific amounts of the purchase price of the stock to the covenants not to compete. Notwithstanding, Peterson considered the covenants to be a significant factor in the purchase agreement. He would not have purchased the stock of Instruments without them, and he believed that one-third of the contract price was allocable thereto. While the sellers believed that the covenants were important to Peterson, they were not aware that any allocations of the purchase price would be made.

On Peterson, Inc.'s Federal corporate income tax return for its year ending August 31, 1976, it allocated $100,000 to the covenants not to compete, to be amortized over the 5-year life of the covenants.[5] Richard Jungck, a certified public accountant with a law degree who specialized in taxation, advised Peterson, Inc., with regard to the allocation. Relying on Rev. Rul. 68–609, 1968–2 C.B. 327, concerning the determination of

---

[4] On Nov. 7, 1975, and as part of the sale transaction, Moses entered into an employment with Instruments whereby he agreed, inter alia, to employment at that corporation for a period of 5 years as its general manager. That contract contained its own restrictive covenant as follows:

"12. *Restrictive Covenant.* During the term of this Agreement and for a period of five (5) years after the termination of this Agreement, for whatever reason, Moses will not, within a radius of fifty (50) miles from any place in the United States where the Employer does business or where products are manufactured or sold by the Employer, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, or control of any business similar to the type of business conducted by the Employer at the time of the termination of this Agreement."

[5] On Nov. 20, 1979, Peterson, Inc., filed amended returns (Forms 1120X) for the fiscal years ending Aug. 31, 1976, and Aug. 31, 1977, increasing its allocation to the covenants to $181,691, and seeking respective refunds of $6,535 and $7,842. In its petition herein, Peterson, Inc., reiterated its contention that the larger figure represents the correct allocation to the covenant, but on brief it has reverted to the $100,000 figure.

the fair market value of intangible assets of a business, he concluded the proper allocation to be $100,000.

The sellers did not allocate any portion of the contract price to the covenants not to compete. They did not become aware of Peterson, Inc.'s allocation to the covenant until late 1978 when an Internal Revenue Service inquiry revealed inconsistent treatment in the allocation to the covenant.[6]

The respondent has taken inconsistent positions, determining deficiencies against each of the sellers and against Peterson, Inc. With respect to the sellers, respondent has determined that $100,000 of the aggregate sale price is allocable to the covenants not to compete and thus taxable as ordinary income. As regards Peterson, Inc., respondent has disallowed the claimed deductions for amortization of the covenants not to compete for its fiscal years ending August 31, 1976, and August 31, 1977.

## OPINION

The issue to be decided is what portion, if any, of the $280,000 purchase price of Instruments is properly allocable to the covenants not to compete. Both the sellers and Peterson, Inc., have a substantial interest in the determination of this issue. To the extent an amount was paid by Peterson, Inc., for the covenants not to compete, it has purchased intangible assets amortizable over the 5-year lives (sec. 1.167(a)–3, Income Tax Regs.), and the sellers must recognize ordinary income for their forbearance to compete. *Major v. Commissioner*, 76 T.C. 239, 245 (1981); *Lazisky v. Commissioner*, 72 T.C. 495, 500 (1979). Alternatively, to the extent Peterson, Inc., paid for stock and/or goodwill (nonwasting assets), it has purchased nonamortizable assets, the sale of which by the sellers generates only capital gain income to them. *Major v. Commissioner, supra; Lazisky v. Commissioner, supra.*

The sellers contend that no amount is allocable to the covenants because the contract of sale provides for no allocation thereto, the parties did not intend for an allocation to be made, and any such allocation would lack economic reality.

---

[6]Moses first learned of Peterson, Inc.'s allocation of $100,000 to the covenant not to compete at a board of directors meeting of that firm, but he remained unaware of the tax consequences of such an allocation until notified by the Internal Revenue Service.

Conversely, Peterson, Inc., maintains that an allocation of $100,000 to the covenants is appropriate because the contract of sale, while not specifying a precise amount, provided for some allocation, the convenants had real economic value, and the covenants were bargained for in the course of the sale.

Respondent, as a stakeholder, has taken inconsistent positions, assessing deficiencies against both Peterson, Inc., and the sellers. At trial respondent did not indicate a preference as to whether the sellers or Peterson, Inc., should prevail; however, on brief respondent strongly advocates the sellers' position. In fact, he did not argue alternative liability of the parties, but merely seeks that his determination be sustained in full against Peterson, Inc., and be overruled in full in favor of the sellers.[7] In cases such as the one at bar, involving allocations to covenants not to compete, the respective petitioners each bear the burden of proving that respondent's determination as to them is erroneous. *Welch v. Helvering*, 290 U.S. 111 (1933); *Wilmot Fleming Engineering Co. v. Commissioner*, 65 T.C. 847 (1976); Rule 142(a), Tax Court Rules of Practice and Procedure.

This Court has long held that where a taxpayer has entered into an agreement that includes specific terms, the tax consequences of which are in issue, "strong proof" must be adduced by the taxpayer seeking to establish a position at variance to the language of the agreement. *Major v. Commissioner*, 76 T.C. 239, 247 (1981); *Lucas v. Commissioner*, 58 T.C. 1022, 1032 (1972). There are two primary elements to which this burden of proof relates. It must be established that the covenants in issue were actually intended as part of the contract and also that the covenants had independent economic significance such that we might conclude that they were a separately bargained-for element of the agreement. *Major v. Commissioner, supra; Lazisky v. Commissioner*, 72 T.C. 495 (1979); *Lucas v. Commissioner, supra.*

The sellers herein contend that Peterson, Inc., bears the burden of "strong proof" since it is expressly attempting to

---

[7]Notwithstanding respondent's failure to argue in the alternative on brief, and his apparent concession of his determination against the sellers, we shall assume that no concession was intended and that to the extent part of the purchase price is allocable to the covenants not to compete, the sellers' proposed deficiency should be sustained.

alter the terms of the written contract by assigning a value to the covenants not to compete where none had been provided in the agreement. Both respondent and Peterson, Inc., assert that the "strong proof" doctrine is inapplicable herein because none of the parties are attempting to vary the terms of this contract as written, but merely to construe the terms. We agree with respondent and Peterson, Inc.

The terms of the contract are clear and there is little question that the language thereof contemplates an allocation to the covenants. Not only does the contract specify that the sale price of $280,000 is paid both for each seller's shares of Instruments and for their covenants not to compete, but the language of the paragraph concerning said covenants is exceedingly strong:

It is the intention of the Sellers and the Buyer that the execution of these covenants not to compete be considered as *materially significant and essential to the closing* as set forth in numbered paragraph 2 of this Agreement and that *such covenants are a material portion of the purchase price* set forth hereinabove. [Emphasis supplied.]

Thus, while it is unclear from the contractual terms what specific amount should be allocated to the covenants not to compete, some allocation is surely provided for. Under these circumstances, application of the "strong proof" doctrine is inappropriate. Compare *Kinney v. Commissioner*, 58 T.C. 1038 (1972).[8] Neither party seeks to vary the terms of the contract. They both merely attempt to construe an obviously ambiguous term of the contract in a light most favorable to their respective causes. This being the case, both Peterson, Inc., and the sellers bear the burden of proving that their respective interpretations of the words "material portion" and "materially significant" are correct by a mere preponderance of the evidence. See *Kinney v. Commissioner, supra* at 1043. See also *Major v. Commissioner*, 76 T.C. at 247 n. 6. Moreover, we note that in view of the fact that both the buyer and the sellers are parties to this proceeding, there is even less reason to apply the "strong proof" rule. Cf. *Freeport Transport, Inc. v. Commissioner*, 63 T.C. 107 (1974), and particularly the concurring opinion of Judge Dawson at pages 116–117.

---

[8]See also *Miller v. Commissioner*, T.C. Memo. 1964–305.

We shall first address whether the parties to the contract intended an allocation of the purchase price to the covenants not to compete. For the following reasons, we believe such an allocation was intended.

First, while the discussion of covenants not to compete was not part of the negotiation leading up to the "handshake" between Hansen and Peterson on October 29, 1975, immediately thereafter Peterson demanded covenants not to compete, and Hansen agreed. Through the entire meeting on that date, the only terms of the sale which were discussed between the parties were price, method of payment, and covenants not to compete. It is very clear from the record that Peterson considered the covenants an important part of the contract, and the sellers were aware of that fact.

Second, the written contract specifically states that the parties intend the covenants to be "materially significant and essential to the closing" and they intend the covenants to be a "material portion of the purchase price." We find this the most persuasive evidence of what the parties actually intended. See *Major v. Commissioner, supra* at 250; *Rich Hill Insurance Agency, Inc. v. Commissioner* , 58 T.C. 610 (1972); *Annabelle Candy Co. v. Commissioner*, 314 F.2d 1 (9th Cir. 1962). Each of the sellers testified that he read the contract of sale in its entirety, and that if he disagreed with a provision, he spoke up. None of them made any comment regarding the language relating to the covenants. Each seller signed the contract aware of its contents. Mr. Hansen testified that he understood the word "material" in the covenant clause to mean some object, such as a piece of wood, steel, or paper, and that he knew of no other connotations for that word. We find such testimony from a college professor, having both a bachelor's and a master's degree, to be entirely incredible. Mr. Welch specifically testified that he considered the covenants a "significant and important part [of the contract] to Mr. Peterson."

Finally, each of the sellers testified that he intended the sale to yield him only capital gain income. This, however, is not the intent at issue. What is important in the facts herein is whether the sellers intended that the covenants actually be a part of the agreement (i.e., whether Peterson, Inc., slipped the covenants into the contract without their knowledge). The

facts unquestionably show that the sellers were aware of the terms. Moreover, the sellers were represented by counsel who read the contract and approved of its contents. That the sellers and/or their counsel did not intend, and were not aware of, the tax consequences of the disputed language is not significant. As stated in *Hamlin's Trust v. Commissioner*, 209 F.2d 761, 765 (10th Cir. 1954), affg. 19 T.C. 718 (1953):

It is true that there was very little discussion of the suggested allocation. *But the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it.* The proposed change in the contract was clear. All parties participating in the conference agreed to it. The owners of stock present signed the written contract at the time and others signed it later. *It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences.* While acting at arm's length and understandingly, the taxpayers agreed without condition or qualification that the money received should be on the basis of $150 per share for the stock and $50 per share for the agreement not to compete. Having thus agreed, the taxpayers are not at liberty to say that such was not the substance and reality of the transaction. * * * [Emphasis supplied.]

We next must consider whether the allocation by Peterson, Inc., of $100,000 to the covenants not to compete had independent economic significance (comported with economic reality).

Hansen had been involved in Instruments for only 6 years as of the time of the sale of its stock to Peterson, Inc. In that relatively short time, he had turned the corporation around financially; from a loss of $8,500 in 1971, to a profit of $30,000 in 1974. On the other hand, he was 65 years of age in 1975, intended to retire, and he was only marginally active in the business. Yet he was aware of all of the activities of Instruments and extremely capable physically and mentally to compete with Peterson, Inc. He stated at the time of trial (June 1981);

This may sound vain, but if it is made out of metal and can be dampened or welded together or shaped or machined or punch holes in it or anything like that, I'm probably capable of doing it. I have got a vast amount of knowledge back of me. I don't know—I wouldn't know where to limit it to what I can't do.

Additionally, with his approximately 71-percent share of the

$280,000 proceeds of sale of Instruments' stock, Hansen had the financial resources to compete if he changed his mind about retirement.

Welch, while not active in Instruments' business, had the machinery and tools ready at his disposal through Welch Manufacturing Corp. to produce the same products as Instruments. Despite his age (66 years in 1975) and inactivity in Instruments, he was a potential competitive threat.

Moses was also a competitive threat by virtue of his vast knowledge of Instruments' product development and design, its labor and sales forces, and its customers. The fact that Moses signed an employment contract with Peterson, Inc., for the duration of his covenant not to compete is entitled to weight, but is not determinative. *Maseeh v. Commissioner*, 52 T.C. 18, 23 (1969). There was always the possibility that Moses or Peterson, Inc., could breach the employment contract or that Moses could be terminated for cause. In either case he could, absent a covenant not to compete, have engaged in competition. Furthermore, the fact that the employment contract contained its own restrictive covenant is of no moment since Moses testified that the employment contract and covenant not to compete were both part and parcel of the stock-sale transaction.

Most telling of all evidence regarding the risk of competition by the sellers is Moses' admission at trial that with Welch's plant and equipment, the knowledge and abilities of Moses and Hansen, the members of Instruments' sales force who could be lured away from Instruments, and the sellers' capital, they could have, absent the covenants not to compete, started all over again with minimal expense or delay. Additionally, all sellers were then in good health. Surely these facts created a significantly high risk of competition from Peterson, Inc.'s point of view—a risk which it would reasonably pay a substantial price to avoid.

As for the amount of Peterson, Inc.'s allocation to the covenants not to compete of $100,000, we note that the book value of Instruments' assets was $90,000. Moses' testimony indicated that the fair market value of these assets could have been at most $160,000. Assuming this to be the case, it leaves at the very least $120,000 to be allocated between goodwill and the covenants not to compete. Little evidence was presented

regarding the goodwill of Instruments. Moses testified that the reputation of Instruments was not a big aspect of that corporation's sales of its products—a fact that tends to diminish the value of goodwill. On the other hand, Instruments' profits had been steadily increasing since 1971—a factor indicating the existence of goodwill.

While we disagree with Talpers, the draftsman of the contract of sale, that "material portion" necessarily means more than one-half, it certainly refers to something in excess of a nominal amount. The allocation originally chosen by Peterson, Inc.—$100,000—represents approximately 35.7 percent of the purchase price of $280,000.[9] In light of all the facts presented, we think this allocation is too high and, on the basis of the entire record, hold that $70,000 is the appropriate allocation to the covenants not to compete. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930).

Accordingly,

*Decisions will be entered under Rule 155.*

_____

[9]Respondent alleges that Rev. Rul. 68–609, 1968–2 C.B. 327, which was used by Peterson, Inc.'s accountant to value the covenants not to compete, is not an appropriate valuation method for such covenants. We need not, and thus do not, decide that issue herein.

