IRVING H. BRAIN, JR., and KATHLEEN B. BRAIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JAY HEARIN REALTOR, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brain v. Commissioner
Docket Nos. 39472-86; 39565-86
United States Tax Court
T.C. Memo 1990-35; 1990 Tax Ct. Memo LEXIS 35; 58 T.C.M. (CCH) 1249; T.C.M. (RIA) 90035; January 22, 1990
John E. Cicero, II, and Terrence F. Pyle, for the petitioners. Monica J. Miller, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In timely notices of deficiency, respondent determined deficiencies in petitioners' Federal income taxes for 1982, 1983, and 1984, additions to tax, and additions to interest as follows: Petitioners Irving and Kathleen Brain
Docket No. 39472-86
Additions to Tax or Interest, I.R.C. Secs. [1]
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661
6621(c) [2]
1982
$ 19,879.44
$ 993.97
*
$ 1,987.94 **
1983
9,895.19
494.75
*
989.52 **
*37 Petitioner Jay Hearin Realtor, Inc. Docket No. 39565-86
Additions to Tax or Interest, I.R.C. Secs.
Year
Deficiency
6651(a)(1)
6653(a)(1)
6653(a)(2)
6621(c)
1983
$ 7,188.61
-
$ 359.43
* **
1984
8,089.61
$ 373.24
404.48
* **
In these consolidated cases, the primary issues for decision are: (1) Whether the fees in question represent part of the purchase price of the stock in petitioner Jay Hearin Realtor, Inc. ("JHR") so that the fees paid are not deductible by JHR and are taxable as constructive dividends to the stockholder petitioners Irving H. and Kathleen B. Brain; and (2) whether JHR has satisfied the substantiation requirements of section 274(d) with respect to certain business and entertainment expenses. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Irving H. and Kathleen B. Brain resided in Tampa, Florida when they filed their petition. Petitioner JHR maintained its principal office in Tampa, Florida *38 when it filed its petition. JHR was organized under Florida law in 1948 by Jay L. Hearin. The primary business of JHR was the management of office and warehouse buildings, small shopping centers, and other commercial properties. Due to financial difficulties, in 1962 all of the stock of JHR was sold by Jay L. Hearin and other shareholders of JHR to Thomas and Carolyn Sheehan and another individual for $ 55,000, approximately the amount of JHR's then-existing debt obligations. Thomas Sheehan had worked for JHR since 1952. In 1969, the other individual died, and Mr. Sheehan and his wife purchased the balance of the stock in JHR for $ 20,000. Thereafter until 1978, the Sheehans were the sole stockholders of JHR. From 1974 through 1978, annual gross receipts of JHR ranged from $ 175,000 to $ 263,000. The contracts under which JHR performed management services were subject to termination upon notice from JHR's clients. Most of JHR's largest contracts for management services had been in effect for 10 to 15 years, due primarily to Mr. Sheehan's personal relationship with the clients. In 1976, the Sheehans decided to sell JHR. They sought a selling price of $ 270,000. Initially, *39 the Sheehans represented themselves and JHR in negotiations with prospective buyers. On June 5, 1976, petitioners Irving H. and Kathleen B. Brain made an offer to purchase the stock of JHR and to take over all of JHR's business for $ 270,000. The Brains drafted their initial offer to purchase the stock of JHR without assistance of lawyers or accountants. Prior to the purchase of JHR, Irving Brain as an employee of a bank had some limited experience managing commercial properties. The Brains, however, had no significant experience owning or managing a business. They did not know JHR's clients, and they were not familiar with the properties JHR managed. For these reasons, the Brains' initial offer to purchase the stock of JHR included a provision under which the Sheehans, after the sale of JHR stock to the Brains, would be obligated to provide consulting services to JHR and to the Brains for a period of 12 years without additional compensation, other than reimbursement of expenses. The Brains' offer of June 1976 to purchase the stock of JHR was not accepted. Over the course of the next two years, the Sheehans and the Brains hired lawyers to represent them in their continuing *40 negotiations with regard to the sale of JHR and with regard to the obligations to which the Sheehans would be subject after the sale. Various offers and counter offers were proposed under each of which it was generally contemplated that the Sheehans would be obligated to perform consulting services and/or under which they would be subject to covenants not to compete with JHR after the sale. On February 17, 1978, the Sheehans and the Brains finally entered into a written agreement with respect to the sale of JHR to the Brains. The written agreement was reflected in a limited partnership agreement between the Sheehans and the Brains. It called for the contribution by the Brains to the limited partnership of $ 46,000 in cash and a $ 4,000 personal recourse promissory note due on May 1, 1979, bearing interest at 10 percent. In exchange, the Brains would receive approximately a 50 percent ownership interest in the limited partnership. The limited partnership agreement called for the contribution by the Sheehans to the limited partnership of all of the stock of JHR in exchange for which the Sheehans would receive from the partnership $ 46,000 in cash, [3] an assignment from the partnership *41 of the Brains' $ 4,000 promissory note, and a 50-percent ownership interest in the limited partnership. Apparently on April 30, 1978, the transaction as described generally above closed. The limited partnership agreement anticipated the execution by the Sheehans and the Brains of the following additional documents: (1) A written sales agreement between the Sheehans and the limited partnership, on the one hand, and the Brains, on the other, under which the entire stock interest in JHR would be transferred to the Brains without further consideration; and (2) the execution of a written consulting agreement between the Sheehans and JHR under which the Sheehans would be available to and would provide consulting services to the Brains in connection with the business of JHR and under which the individual participants in the transaction would be subject to written covenants not to compete with JHR for 12 years. Under the consulting agreement, the Sheehans were to be paid $ 2,690 per month from June 1, 1978, through May 1, 1990. Apparently, neither the sales agreement *42 nor the consulting agreement (which was to include the covenants not to compete) was formalized by any written documents other than the descriptions thereof in the limited partnership agreement. The parties, however, considered themselves bound by the terms of the sales agreement and consulting agreement (including the covenants not to compete) and have honored their obligations thereunder from the time the limited partnership agreement was entered into through the time of trial. The Brains have managed the business of JHR as the sole owners. The Sheehans have provided periodic consulting services to JHR and to the Brains concerning the business. Although they moved to New Hampshire sometime after the transfer of ownership of JHR to the Brains, the Sheehans have returned to Florida on average three or four times a year. They have periodically met personally with the Brains and discussed the business of JHR, and they have discussed the business of JHR over the phone. The Sheehans have not entered into any competing business with JHR, and JHR has made the monthly payments of $ 2,690 to the Sheehans. With regard further to the consulting agreement and the covenants not to compete, *43 both of these provisions were described in section 6 of the limited partnership agreement, which section was labeled "Contract for Consulting Services." The only consideration provided in the agreement in exchange for the Sheehans' obligations arising under section 6 of the partnership agreement (which as indicated included the description of both the consulting agreement and the covenants not to compete) was the $ 2,690 monthly fee. Section 6 itself provided for the consideration, and, although section 6 referred to the consideration as a "consulting fee," it expressly provided that the covenants not to compete were a "substantial part" of the contractual obligations entitling the Sheehans to the consulting fees. On JHR's corporate Federal income tax returns for its 1983 and 1984 taxable years and subsequent taxable years through the time of trial, the monthly $ 2,690 in consulting fees paid to the Sheehans have been deducted as current business xpenses. On the Sheehans' individual joint Federal income tax returns for 1982 and 1983 and subsequent years through the time of trial, the same monthly fees were reported as ordinary taxable income received by the Sheehans in connection *44 with the consulting agreement. On audit, respondent determined that the monthly fees of $ 2,690 paid by JHR to the Sheehans represented part of the Brains' purchase price for the JHR stock. Accordingly, respondent disallowed the current deductions claimed with respect thereto by JHR and treated the fees as payments made by JHR on the Brains' behalf with respect to the Brains' purchase of JHR stock and taxable as constructive dividends to the Brains. Respondent also disallowed certain travel and entertainment expenses of JHR for lack of substantiation. OPINION Monthly Fees
In cases involving an allocation between various assets of consideration received or paid in connection with the sale or purchase of a business, a dispute often arises between the seller and buyer as to the proper allocation, each having a different interest from a tax standpoint in the allocation. In such cases respondent may simply be a stakeholder. See for example Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. 72, 80-81 (1982), affd. F.2d (10th Cir. 1984, 84-2 USTC par. 9885; 54 AFTR 2d 84-5407). In the instant case, however, the sellers and *45 buyers treated the monthly fees consistently -- JHR and the Brains treated the fees as deductible ordinary and necessary business expenses to JHR, and the Sheehans reported the fees received each year as ordinary taxable income. This treatment by all participants to the transaction is consistent with petitioners' characterization of the fees as representing JHR's payment for consulting services and for the covenants not to compete, but is inconsistent with respondent's characterization of the fees as representing the payment by JHR, on the Brains' behalf, of part of the purchase price of the JHR stock purchased from the Sheehans. We have held that where a taxpayer seeks to establish a position at variance with specific language of a written agreement, strong proof must be offered in support of such an interpretation. Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. at 81. In the context of a dispute over an allocation to a covenant not to compete, we have held that this rule requires taxpayers to show that the covenant not to compete was intended as part of the agreement *46 and that the covenant had independent economic significance as a separately bargained-for element of the agreement. Peterson Machine Tool, Inc. v. Commissioner, 79 T.C. at 81; Major v. Commissioner, 76 T.C. 239, 247 (1981); Lazisky v. Commissioner, 72 T.C. 495, 502 (1979), affd. on another issue Magnolia Surf, Inc. v. Commissioner, 636 F.2d 11 (11th Cir. 1980). In a number of courts, including the Eleventh Circuit Court of Appeals to which this case would be appealed, parties to a sales agreement will only be allowed to vary from allocations set forth in a sales agreement where they establish proof of mistake, fraud, undue influence, or any other ground that, in an action between the parties to the agreement, would be sufficient to set the agreement aside or to alter its construction. Bradley v. United States, 730 F.2d 718, 720 (11th Cir. 1984); Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965). Regardless of which *47 of the above rules of proof if any is applied to the facts of this case, petitioners have established that the $ 2,690 in fees paid monthly by JHR to the Sheehans represented payment for the Sheehans' obligations under the consulting agreement to provide consulting services and to avoid competing with JHR, and that the consulting services and the covenants not to compete were an intended part of the agreement having economic significance as separately bargained-for elements of the agreement. As indicated, the adverse parties to the transaction consistently so treated the fees. The Sheehans did so contrary to their own tax position. Mr. Sheehan was a particularly persuasive and credible witness. The new owners of JHR understandably wanted a long-term consulting agreement with Mr. Sheehan to have the benefit of his business acumen and his long-term relationship with the clients of JHR, as well as covenants from Mr. and Mrs. Sheehan that they would not compete with JHR in years subsequent to the transfer of ownership. We also doubt that either the strong proof rule or the rule of Commissioner v. Danielson, supra, has any application where some aspects of the *48 transaction are not clear. In this case, some of the agreements that were to be formalized in separate written form were not so formalized. The documentation, however, that we do have (namely, the description of the consulting agreement in the limited partnership agreement) indicates that the fees in question were to be paid in connection with the consulting agreement and that consulting services as well as the covenants not to compete were part of the consulting agreement. In spite of their failure to formalize in written form some aspects of the overall transaction, the parties to the transaction understood the terms of their agreement. They have generally abided by the agreement, and we perceive no reason to rewrite their agreement or to undo the agreement they appear to have entered into. Respondent emphasizes that the fees in question were to be paid even after the death of the Sheehans (in favor of the estate or heirs of the Sheehans) -- an indication that the fees were not for consulting services or the covenants not to compete. Where, however, consulting services are so valuable *49 that the purchaser of a business agrees to pay therefor for a set period of time regardless of the death or disability of the consultant, that feature of the agreement will not justify a different treatment of the fees. Hornaday v. Commissioner, 81 T.C. 830, 839 n.7 (1983); Yelencsics v. Commissioner, 74 T.C. 1513, 1525 (1980); Wager v. Commissioner, 52 T.C. 416, 419 (1969). Respondent also argues that other features of the consulting agreement and covenants not to compete compel a decision in his favor. We have considered respondent's arguments and find them unpersuasive. On the facts of this case and particularly in light of the credible testimony offered by the individual participants in the underlying transaction, our decision is for petitioners on this issue. Travel and Entertainment Expenses
Petitioners argue that they are entitled to additional business travel and entertainment expense deductions under section 274 even though they have not satisfied the substantiation requirements of that section with respect to the claimed expenses. Petitioners base their argument on the fact that they satisfied the substantiation *50 requirements of section 274(d) with respect to some business travel and entertainment expenses for each year in dispute. Without citing any authority, petitioners argue that once a taxpayer satisfies the section 274(d) substantiation requirements for some expenses, the Court is entitled to use its authority under Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930), to estimate for the taxpayer additional allowable business travel and entertainment expenses. We disagree. The substantiation requirements of section 274(d) apply to all of a taxpayer's claimed business travel and entertainment expenses. Dowell v. United States, 522 F.2d 708, 712 (5th Cir. 1975). Additions to the Tax
The final issue concerns the additions to tax and interest. Petitioners failed to address the additions to tax. We therefore sustain respondent's determinations under section 6651(a)(1) and section 6653(a)(1) and (2). Rule 142(a). Because of our resolution of the primary issue in this case in favor of petitioners, we conclude that petitioners are not liable *51 for additional interest under section 6621(c). Also and for the same reason, we doubt the applicability of the section 6661 addition to tax for substantial understatements of income tax. We reserve ruling on the applicability of that addition to tax until after the parties have attempted to resolve this matter in the context of the Rule 155 computation. Based on our resolution of the above issues, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, and all rule references are to Tax Court Rules of Practice and Procedure. ↩
2. In the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744, Congress amended Code section 6621 by, among other things, redesignating subsection (d) as subsection (c).↩
*. 50 percent of the interest due on the total amounts of the deficiencies. ** 120 percent of the underpayment rate established under section 6621(a)(2). ↩
*. 50 percent of the interest due on the total amounts of the deficiencies. ** 120 percent of the underpayment rate established under section 6621(a)(2).↩
3. The agreement does not make completely clear whether the Sheehans were to receive $ 46,000 or $ 26,000 in cash.↩