T.C. Memo. 2000-10


UNITED STATES TAX COURT


JOHN T. JORGL AND SHARON ILLI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11508-98.          Filed January 11, 2000.


Ps, husband and wife, operated a child care business of
which P husband was the sole shareholder.  P subsequently
established a charitable remainder unitrust and contributed
all of his shares in the child care business to the trust.
The trust later sold the business and received all proceeds
of the sale.  The purchase agreement between the trust and
the buyers contained a covenant not to compete, and Ps
signed a separate document entitled "COVENANT NOT TO
COMPETE" at the time of sale.  Ps reported no income as a
result of this transaction, and R determined a deficiency
for taxes attributable to the portion of the sale price
allocated to a covenant not to compete.

<u>Held</u>: Execution of a noncompetition agreement resulted
in taxable income to Ps to the extent of the purchase price
attributable thereto.  Although the trust received all
proceeds of the sale, Ps were the true earners of the
income. <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 604 (1948)
and <u>Lucas v. Earl</u>, 281 U.S. 111, 114-115 (1930), applied.

The intentions of the parties involved in the transaction and the economic reality of Ps' covenant render a portion of the consideration paid properly allocable to their promise.

Held, further, Ps, relying upon professional advisers, acted reasonably and in good faith with respect to their tax treatment of the sale transaction and are not liable for the accuracy-related penalty under sec. 6662, I.R.C., for a substantial understatement of income tax.

William J. Mitchell and Kevin P. Courtney, for petitioners.

Steven Walker, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined a Federal income tax deficiency for petitioners' 1993 taxable year in the amount of $120,439.  Respondent also determined an accuracy-related penalty of $24,088 for 1993, pursuant to section 6662(a).

The issues for decision are as follows:

(1) Whether the sale of a business by a charitable remainder unitrust resulted in taxable income to petitioners by reason of a covenant not to compete executed in connection with the sale; and

(2) whether petitioners are liable for the section 6662(a) accuracy-related penalty on account of a substantial understatement of income tax.

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties, with accompanying exhibits, are incorporated herein by this reference.

John T. Jorgl and Sharon Illi (petitioners) are married and resided in Orange Park, Florida, at the time of filing their petition in this case.

The Business--Little Rascals Child Care Centers, Inc.

Mr. Jorgl (petitioner) collaborated with Ms. Melanie Biggs to found a licensed day care center and school in Sunnyvale, California. An architect by profession, petitioner designed the facility. The business was incorporated under the laws of California in June of 1980 as Little Rascals Child Care Centers, Inc. (Little Rascals), and opened the following September. Petitioner and Ms. Biggs also founded a second child care center in Milpitas, California, which was sold in 1986 or 1987.

In 1985, petitioner purchased the stock owned by Ms. Biggs in Little Rascals and became the sole shareholder. He maintained an office on the center's premises, managed the business operations of the enterprise, served as president, and was a

member of the board of directors.  Petitioner Ms. Illi became director of the school as well as a corporate officer.  Both were employees of the corporation and were compensated for their services.

Little Rascals provided child care and development services for children ranging in age from 3 months to school age.  Such services included direct care and supervision; resource and referral programs; and instructional programs in academics, social skills, arts, and athletics.  The center met all governmental requirements for licensing and had an excellent reputation in the community as a quality child care center. Petitioners developed and maintained close interpersonal relationships with parents, teachers, and staff.  This hands-on approach engendered a trust and confidence which frequently led parents to return with their later children.

Transfer of the Business to a Charitable Unitrust

In November of 1990, petitioners met with attorney Richard Polse and informed him that they were considering the sale of the Little Rascals business and were interested in achieving estate planning and charitable giving goals.  Petitioners were concerned with establishing an income source for support during retirement years.  They also desired to contribute to Project Grant a Wish after witnessing the generosity of the charity toward a child in their center who had died of leukemia.  Mr. Polse advised

petitioners of the way in which a charitable remainder unitrust could facilitate these aims. He, as well as petitioners' accountant, Tim Kehl, also explained the tax consequences of such an arrangement.

Petitioners decided to form a charitable remainder unitrust, and the trust instrument was prepared by Mr. Polse. Petitioners were designated as the income beneficiaries of the Jorgl Unitrust (the trust), and Project Grant a Wish was named the charitable remainder beneficiary. For their lifetimes, petitioners were to receive annual distributions totaling the lesser of the trust income for the taxable year or 9 percent of the fair market value of the trust assets. The trust was irrevocable, and petitioners were given no rights to or control over trust assets beyond receipt of the above-specified distributions. Following their deaths, the trust would terminate and Project Grant a Wish would receive the trust corpus. Cupertino National Bank was named as the trustee.

On June 26, 1991, petitioner as grantor and Cupertino National Bank as trustee executed a "Charitable Remainder Unitrust Agreement". On June 27, 1991, the stock certificate transferring all of petitioner's shares in Little Rascals to Cupertino National Bank as trustee for the Jorgl Unitrust was signed. Petitioners continued to serve as employees, officers, and directors of Little Rascals.

Sale of the Business to the Shahs

A meeting of the Little Rascals board of directors was held on June 27, 1991.  The board resolved to proceed with having the corporation listed for sale with a business broker, subject to the signing of the listing by the trustee owner.  The brokerage firm so engaged subsequently prepared an extensive prospectus to market Little Rascals.  This document erroneously stated that the center "was established in 1980 by the current owner, an architect".  One of the "TERMS" recited in the document was "COVENANT 5 years 100 miles".

In early 1993, this prospectus was presented to Divyesh and Priti Shah by Art Withop, their business broker.  The Shahs understood from reading the prospectus that the current owner was an architect and the founder of the center, and that the covenant was being offered by him.  The Shahs and their broker met with petitioners and the listing broker in April of 1993 to discuss the possible sale of the business.  After a series of offers and counteroffers passing between the brokers, the Shahs prepared a "Purchase Agreement for Corporate Stock".  It was at this time that they first learned of the existence of the trust.  The trustee had not been involved in prior meetings or in the negotiation of the sale price.  On May 24, 1993, Mr. Shah executed the purchase agreement as "buyer", and on May 26, 1993,

an officer of Cupertino National Bank as trustee for the Jorgl Unitrust signed as "seller". Petitioners were neither named in nor signatories to this document.

The purchase agreement designated $650,000 as the "purchase price of the stock and any covenant not to compete". Paragraph 16 then contained the following language regarding a covenant not to compete:

> COVENANT NOT TO COMPETE: For a period of 5 consecutive years from COE [closing of the agreed escrow], seller shall not directly or indirectly carry on a similar business within a radius of 100 miles of the business being sold, nor assist anyone else except the corporation and buyer to do so within these limits: nor shall seller have any interest, directly or indirectly, in such business, except as an employee of the business being sold. Paragraph 19 will not prevent injunctive relief to enforce this covenant pending arbitration. Any part of the purchase price to be allocated to this covenant shall be agreed upon by the parties and submitted to escrow prior to COE.

In addition, a handwritten amendment stating "and officers" was inserted by the Shahs' broker after the first "seller" in the printed paragraph.

Mr. Shah subsequently drafted a covenant not to compete for petitioners and the Shahs to sign. When Mr. Shah then called petitioner to inform him that the draft had been prepared, petitioner requested that the document be sent to his attorney, Mr. Kehl, for review. On July 29, 1993, Mr. Kehl received a fax of a noncompetition agreement "between John Jorgl and Sharon Illi * * * and Divyesh P. Shah and Priti D. Shah". Mr. Kehl advised

petitioners not to sign the document in the form presented. He told petitioners that "they would be okay with signing it if the Shahs' name [sic] were removed". Thereafter, in a subsequent draft, Mr. Shah deleted any reference to himself and his wife. This latter document provided that instead of not competing with the Shahs, petitioners would not compete with Little Rascals.

The closing of the sale took place on July 30, 1993, in San Jose, California. Closing documents signed by the Shahs and the trustee stated: "Purchase price of stock (pay to Seller): 350,000.00" and "Purchase price of Covenant Not to Compete (pay to Seller): 300,000.00". Also at the closing, petitioners alone signed a separate document entitled "COVENANT NOT TO COMPETE" and reading in its entirety as follows:

> This agreement is between John Jorgl and Sharon Illi, who were officer's [sic] of Little Rascals Child Care Centers, Inc. and Little Rascals Child Care Centers, Inc. regarding the sale of Little Rascals Child Care Centers signed on the 30th of July, 1993.
>
> The agreement is as follows:
>
> 1) John Jorgl and Sharon Illi will not compete with Little Rascals in the preschool/day care/school age children business; nor assist anyone else except the corporation and the buyer of Little Rascals within limits defined herein; nor have any interest, directly or indirectly, in such business except as an employee of the business being sold for a total of 5 consecutive years within a 100 mile radius of the business (Little Rascals).

2) John Jorgl and Sharon Illi are signing this document with full understanding that competing with Little Rascals would be a breach of contract and both John and Sharon could be severly [sic] liable.

The Shahs discussed their reasons for the above document during the closing, expressing concern that petitioners might personally open another child care center, yet all sales instruments were being signed by the bank on behalf of the trust. Petitioners had indicated that they were leaving the area to travel, but the Shahs perceived the possibility of petitioners' returning and using their reputation to start another center as a continuing threat. Petitioners were 50 and 37 years of age and in good health at the time of the sale. Although petitioners viewed the separate covenant as a voluntary accommodation to the Shahs, they signed in good faith and have never engaged in proscribed competitive activities. They departed from California shortly after the closing and have since resided elsewhere.

The $300,000 allocated to a covenant not to compete was never discussed. Mr. Shah calculated the value and had it included in the closing documents. None involved objected, so no negotiations took place. Mr. Shah prepared a document basing the value of the covenant not to compete on tuition that would be lost if 10 to 15 children left the center due to competition. His computations resulted in a $600,000 figure which he then multiplied by a 50-percent "fudge factor". He was aware that, as buyer, allocating value to a covenant not to compete would be

advantageous from a tax standpoint.  For reasons undisclosed at trial, respondent now concedes that the value of the covenant was $200,000 and not $300,000 as allocated in the closing statements. The full $650,000 price was deposited directly from escrow into the trust's account, and petitioners received no additional compensation for signing the separate document.

Following the closing, the Shahs received from petitioners the business training referenced in the prospectus and the purchase agreement.  The prospectus had indicated that "TRAINING 2 weeks @ 20 hrs." was included in the sale price.  Section 15 of the purchase agreement similarly stated:  "TRAINING:  Seller shall train buyer in the operation of the business".  On August 14, 1993, petitioners sent a letter to memorialize completion of this training which reads in part:  "As of August 13, 1993, Sharon has completed the training with Priti in accordance with the requirements of our Purchase Agreement dated May 24, 1993, Section 15."

Petitioners' Federal income tax return for 1993 did not reflect any income as a consequence of the above transactions.

OPINION

We must decide whether the sale of a business operated by petitioners, after petitioner had transferred all stock in the

business to a charitable remainder unitrust, resulted in taxable income to petitioners by reason of a covenant not to compete executed at the time of the sale.

Petitioners contend that because ownership of the business had been irrevocably transferred to the trust, because they were not parties to the purchase agreement between the trust and the buyers, and because the trust received the entire proceeds of the sale, the covenant not to compete contained in such agreement can have no tax consequences for them. Petitioners further assert that the separate document entitled "COVENANT NOT TO COMPETE" was signed by them only as an accommodation and cannot result in taxable income because it is without true economic value, unsupported by consideration, and unenforceable under California covenant law.

Conversely, respondent argues that the portion of the purchase price attributable to a covenant not to compete is taxable to petitioners. Respondent contends that because petitioners executed a personal covenant in conjunction with the sale of the Little Rascals business and because they, not the trust, posed the only real threat of competition, they cannot escape tax on the income apportioned to such a covenant by anticipatorily assigning that income to the trust. Respondent

also alleges that the covenant has significant economic value, is supported by consideration, and is enforceable under California covenant law.

We conclude that a portion of the consideration paid can properly be allocated to the promise made by petitioners. The intentions of the parties involved in the transaction and the economic reality of petitioners' agreement support such an allocation. Hence, petitioners must be deemed to have earned income by agreeing not to compete and to have anticipatorily assigned such income to the trust. They therefore are required to recognize taxable income, to the extent of the value of the covenant, in connection with the sale of Little Rascals.

Deficiency Issue

General Rules

As a general rule, section 61 defines gross income as "all income from whatever source derived". Case law then specifies that consideration paid for a covenant not to compete is included within this broad definition. See, e.g., Sonnleitner v. Commissioner, 598 F.2d 464, 466 (5th Cir. 1979), affg. T.C. Memo. 1976-249; Montesi v. Commissioner, 340 F.2d 97, 100 (6th Cir. 1965), affg. 40 T.C. 511 (1963). A charitable remainder unitrust, however, is not subject to income tax by reason of section 664(c) unless it has unrelated business income, which is not the case here.

In the present matter, the parties do not contest these basic propositions but differ as to whether any portion of the purchase price received by the trust can be attributed and taxed to petitioners on the grounds of a covenant not to compete. Because all payments flowing from the sale of the Little Rascals business were made directly to the trust, and because respondent does not contend that the trust failed to satisfy the requirements set forth in section 664 for the creation of a valid charitable remainder unitrust, resolution of this question turns on whether petitioners can be said to have actually earned income, which they anticipatorily assigned to the trust, by reason of a promise not to compete.

The principle that substance should govern over form is well established in tax law. See, e.g., Higgins v. Smith, 308 U.S. 473, 477 (1940); Turner Broad. Sys., Inc. & Subs. v. Commissioner, 111 T.C. 315, 326 (1998); Palmer v. Commissioner, 62 T.C. 684, 691 (1974), affd. 523 F.2d 1308 (8th Cir. 1975). A corollary to this principle is the assignment of income theory, under which mere assignment of a right to receive income is insufficient to insulate the assignor from tax liability. See, e.g., Commissioner v. Sunnen, 333 U.S. 591, 604 (1948); Lucas v. Earl, 281 U.S. 111, 114-115 (1930); Palmer v. Commissioner, supra at 692. The true earner of income must bear the tax consequences. See, e.g., Commissioner v. Sunnen, supra at 604;

Lucas v. Earl, supra at 114-115; Palmer v. Commissioner, supra at 692. Thus, if a portion of the consideration paid for Little Rascals is properly allocable to petitioners' promise, they will be deemed to have assigned to the trust income they earned by agreeing not to compete.

In determining whether such a "tax-enforceable" allocation to a covenant has been or should be made, courts have articulated various standards for evaluating sales agreements. See Lazisky v. Commissioner, 72 T.C. 495, 500-502 (1979), affd. sub nom. Magnolia Surf, Inc. v. Commissioner, 636 F.2d 11 (1st Cir. 1980). When a written contract specifies the portion of the purchase price to be allocated to a covenant not to compete and one of the parties seeks to deviate therefrom, two tests frequently adhered to in deciding whether such deviation is warranted are the strong proof rule and the so-called Danielson rule. See, e.g., Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and remanding 44 T.C. 549 (1965); Elrod v. Commissioner, 87 T.C. 1046, 1065-1066 (1986); Smith v. Commissioner, 82 T.C. 705, 712-714 (1984); Lazisky v. Commissioner, supra at 500-502.

Under the strong proof rule, a taxpayer attempting to challenge a contractual allocation must adduce "strong proof", meaning more than a preponderance of the evidence, that the terms of the written instrument do not reflect the actual intentions of

the contracting parties. See, e.g., Elrod v. Commissioner, supra at 1066; Smith v. Commissioner, supra at 713 n.8. Under the more stringent Danielson rule,

> a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. * * * [Commissioner v. Danielson, supra at 775.]

This Court typically applies the strong proof rule but will apply the Danielson rule when the circuit to which appeal would normally lie has adopted that test. See Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971); see also Elrod v. Commissioner, supra at 1065-1066; Smith v. Commissioner, supra at 712 n.6. However, when a contract fails to make an allocation of purchase price to a covenant not to compete or does so in an ambiguous manner, neither the strong proof rule nor the Danielson rule is applicable. See, e.g., Elrod v. Commissioner, supra at 1066; Smith v. Commissioner, supra at 713-714. Instead, the taxpayer must establish by a preponderance of the evidence that respondent's determination of a deficiency is erroneous. See Rule 142(a); Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C. 72, 81-82 (1982), affd. per order (10th Cir., April 2, 1984).

There are two primary elements to which the taxpayer's burden of proof relates. See Peterson Mach. Tool, Inc. v.

Commissioner, supra at 81.  The threshold inquiry is whether the parties mutually intended that an allocation of purchase price be made to the covenant at issue.  See, e.g., Patterson v. Commissioner, 810 F.2d 562, 570-571 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Better Beverages, Inc. v. United States, 619 F.2d 424, 430 (5th Cir. 1980); Peterson Mach. Tool, Inc. v. Commissioner, supra at 81, 83.  Such mutual intent will typically be deemed to exist where "the parties considered the covenant as a valuable part of the entire consideration for the agreement." Illinois Cereal Mills, Inc. v. Commissioner, T.C. Memo. 1983–469, affd. 789 F.2d 1234 (7th Cir. 1986).  Relevant factors for ascertaining intent include both the language of the contract itself and the circumstances surrounding its negotiation.  See, e.g., Patterson v. Commissioner, supra at 570; Peterson Mach. Tool, Inc. v. Commissioner, supra at 83-84.

If such mutual intent is found, courts then proceed to evaluate whether an allocation comports with "economic reality". See, e.g., Patterson v. Commissioner, supra at 571; Peterson Mach. Tool, Inc. v. Commissioner, supra at 84.  Economic reality is defined as "'some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement.'"  Patterson v. Commissioner, supra at 571 (quoting Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961),

affg. 34 T.C. 235 (1960)).  An allocation will generally be given effect where "the covenants had independent economic significance such that * * * [the Court] might conclude that they were a separately bargained-for element of the agreement."  Peterson Mach. Tool, Inc. v. Commissioner, supra at 81.

Application

The instant case involves two documents purporting to establish a covenant not to compete:  The purchase agreement and the separate covenant document.  Paragraph 16 of the purchase agreement dated May 24, 1993, is labeled "COVENANT NOT TO COMPETE".  The printed language of the paragraph states, in pertinent part, that "seller shall not directly or indirectly carry on a similar business".  A handwritten amendment "and officers" has been added after "seller".  The parties to the agreement are the Shahs, designated as "buyer", and the Jorgl Unitrust, designated as "seller".  The agreement was signed by Mr. Shah and by an officer of Cupertino National Bank as sole trustee for the Jorgl Unitrust.  It was not signed by petitioners.

Petitioners alone also signed a separate document entitled "COVENANT NOT TO COMPETE" at the closing on July 30, 1993.  This document states that it is "between John Jorgl and Sharon Illi, who were officer's [sic] of Little Rascals Child Care Centers,

Inc. and Little Rascals Child Care Centers, Inc." It provides that "John Jorgl and Sharon Illi will not compete with Little Rascals".

The allocation of purchase price at issue here was made in a second pair of documents. The BUYER'S CLOSING STATEMENT, signed by Mr. Shah, and the SELLER'S CLOSING STATEMENT, signed by the trustee, each state: "Purchase price of Covenant Not to Compete (pay to Seller): 300,000.00". The separate covenant document signed by petitioners makes no reference to price or payment. The purchase agreement provides that $650,000 is the "purchase price of the stock and any covenant not to compete".

Applicability of the Danielson Rule or the Strong Proof Rule

Given this scenario, the first question that must be addressed is whether either the Danielson rule or the strong proof rule applies. We note as a threshold matter that appeal would normally lie to the Court of Appeals for the Eleventh Circuit, where decisions handed down by the Court of Appeals for the Fifth Circuit prior to October 1, 1981, are precedential. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981). Since the Court of Appeals for the Fifth Circuit adopted the Danielson rule in Spector v. Commissioner, 641 F.2d 376, 384, 386 (5th Cir. 1981), revg. 71 T.C. 1017 (1979), we shall examine

the above agreements in light of its dictates to the extent applicable.  However, we conclude that ambiguities render adherence to the <u>Danielson</u> standard inappropriate here.

An allocation of $300,000 to "Covenant Not to Compete" was made in the closing statements.  Yet documents relating to the transaction can be read, at least facially, as establishing two such covenants.  Both petitioners and the trust, an independent legal entity, signed agreements apparently promising not to compete.  It is thus unclear from the face of the documents what part of the price was paid for which promise.  Hence, the relevant instruments do not evidence an unequivocal allocation of payment to a specific covenant that would justify application of the <u>Danielson</u> rule or, in the alternative, the strong proof rule. Petitioners' burden is therefore to establish by a preponderance of the evidence that the parties lacked mutual intent to allocate any portion of the consideration paid to petitioners' promise or that the allocation had no basis in economic reality.

<u>Existence of Mutual Intent Regarding Allocation</u>

Having determined the appropriate standard of proof, we next address the question of whether those involved in the sale process mutually intended to allocate consideration to the agreement made by petitioners.  As a threshold matter, it should be noted that to view the separate document signed by petitioners as entirely independent from and unrelated to the sales

instruments executed by the trust would be to introduce a level of artificiality warranted neither by the terms of the documents nor by the attendant circumstances. Although petitioners urge such a narrow perspective, a reading of all documents together as evidencing a single, composite transaction appears to be more consistent with the parties' mind-sets at the time of the sale.

The purchase agreement makes reference to covenants from "seller" and, through conscious addition by the buyers' agent, "officers". The agreement further states that $650,000 is the purchase price for the stock and "any covenant not to compete" (emphasis added); it does not preclude apportionment to covenants other than those stated therein. Moreover, the separate covenant executed by petitioners then explicitly sets forth that it is an agreement "regarding the sale of Little Rascals Child Care Centers signed on the 30th of July, 1993." It thus seems reasonable to construe the separate document as carrying out the "and officers" annotation in the purchase agreement.

In addition, the letter written by petitioners to the Shahs only 2 weeks after the sale reveals that they did not view the components of the transaction with the degree of isolation for which they now contend. The letter reads: "As of August 13, 1993, Sharon has completed the training with Priti in accordance with the requirements of our Purchase Agreement dated May 24, 1993, Section 15." The use of "our Purchase Agreement", combined

with the fact that section 15 says "TRAINING: Seller shall train buyer", indicates that petitioners saw themselves as material participants in aspects of the sale other than their separate agreement not to compete. They also apparently recognized that, legal obligations aside, only they could meaningfully act upon certain provisions in the unique situation where a commercial bank sells a child care center. A similar inference can be drawn from the fact that only petitioners, and not the trustee, were involved in the meetings and negotiations with the Shahs which preceded the signing of the purchase agreement. Hence, in seeking to ascertain the parties' intentions with respect to price allocation, we likewise shall view the various participants and documents as interrelated parts of an overall transaction.

Turning then to the substantive issue of mutual intent, we conclude, again by reference to both written instruments and attendant circumstances, that neither the documents themselves nor the surrounding negotiations negate the existence of such intent. The language used (1) in the prospectus advertising Little Rascals for sale, (2) in the purchase agreement, and (3) in the separate covenant document is in each case consistent with an understanding that a noncompetition agreement from petitioners was to form a component of the sales price. The prospectus describes the business as "established in 1980 by the current owner, an architect", makes no mention of the trust, states the

asking price, and lists "COVENANT 5 years 100 miles" under "TERMS". The purchase agreement, as indicated above, has been amended to make reference to a covenant from "officers" and sets forth the total price of the stock and "any covenant". The separate covenant document identifies that it is an agreement "regarding the sale of Little Rascals". These three instruments, collectively, thus cannot sustain petitioners' burden of proving that no part of the $300,000 allocated to "Covenant Not to Compete" in the closing statements was intended as consideration for petitioners' promise.

Furthermore, the surrounding negotiations and circumstances do not require a different conclusion. Although the prospectus was technically erroneous, Mr. Shah testified that he understood the document to mean that petitioner, as founder and seller, was offering the covenant. Petitioners did nothing to correct Mr. Shah's understanding throughout the initial negotiations premised on the prospectus, and the Shahs were not made aware of the existence of the trust until the purchase agreement was drafted. Petitioners subsequently did not object to the addition of the "and officers" language to the purchase agreement. Their reference to "our Purchase Agreement dated May 24, 1993, Section 15" in the letter they sent to the Shahs shortly after the sale, however, shows that they had read the agreement and were aware of its terms. They then complied with the Shahs' request to execute

a separate covenant not to compete despite this awareness of the terms of a purchase agreement which contemplated allocation of price to the stock and to any covenant. Moreover, they signed their covenant at the closing where statements explicitly allocating $300,000 to a covenant not to compete were executed, so if they did not in fact read these closing documents, they certainly had the opportunity to do so.

In addition, petitioners were aware at the time they signed that it was their agreement, not the trust's, upon which the Shahs placed importance. Petitioners' own witness testified that the Shahs' concerns about competition from petitioners and reasons for the separate covenant were discussed at the closing. Hence, petitioners had reason to realize that any significant value the Shahs paid for a covenant not to compete would be attributable to their promise, not to that given by the trust. In that context, they executed a covenant document. In these circumstances, knowledge of a purchase contract which contemplated an allocation of price to a covenant not to compete, combined with knowledge that their agreement was the only such covenant of substantial importance to the buyer, adds up to the type of objective contractual intent to allocate necessary for an allocation to be given effect.

The fact that petitioners did not intend to be taxed on their agreement and sought to avoid that result by refusing to permit the document they signed to refer to the buyers is irrelevant. As explained by this Court:

> What is important in the facts herein is whether the sellers intended that the covenants actually be a part of the agreement (i.e., whether * * * [the buyer] slipped the covenants into the contract without their knowledge). The facts unquestionably show that the sellers were aware of the terms. Moreover, the sellers were represented by counsel who read the contract and approved of its contents. That the sellers and/or their counsel did not intend, and were not aware of, the tax consequences of the disputed language is not significant. As stated in Hamlin's Trust v. Commissioner, 209 F.2d 761, 765 (10th Cir. 1954), affg. 19 T.C. 718 (1953):
>
>> It is true that there was very little discussion of the suggested allocation. But the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. * * * where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. * * *
>
> [Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C. 72, 83-84 (1982).]

Here, petitioners intended that their covenants be a part of the overall sale transaction, they understood from the contents of the documents that they were promising not to compete and that consideration was being allocated to a covenant not to compete, and they knew that in substance the buyers attributed importance to their agreement. These facts regarding the actions of

petitioners and the Shahs convince us that there existed, on the part of petitioners, either a subjective intent to allocate or, at the very least, a conscious acquiescence in the allocation proposed by the Shahs, both of which will support a finding of objective contractual intent.  We therefore conclude that petitioners have failed to carry their burden of showing that those involved in the Little Rascals transaction did not mutually intend that an allocation of purchase price be made to their agreement.

### Economic Reality of Allocation

The question then becomes whether such an intended allocation must nonetheless be disregarded because it would lack economic reality.  However, petitioners' past performance, their present ability, and the actual negotiations reveal a separately bargained-for agreement with a sufficient nexus to prudent business practice to conclude that their agreement had independent economic significance.

As to past performance, petitioner had founded two day care centers and had approximately 13 years of experience in the business.  Little Rascals was uncontestedly a successful enterprise with an excellent reputation.  Petitioners had developed close interpersonal relationships with parents, teachers, and staff.  In addition, their hands-on approach to

involvement in the child care business had often resulted in repeat patronage, as parents returned to enroll younger siblings.

With regard to present ability, petitioners were only 50 and 37 years of age and in good health at the time of the sale. Furthermore, although petitioners mentioned that they planned to travel following the sale, they did not indicate a permanent departure from the geographic area.

Given these circumstances, a prudent business person might reasonably perceive competition from petitioners as a threat to the continued success of Little Rascals, and negotiations related to the sale reveal that the Shahs did in fact have such a concern. Beginning with the conscious addition of the "and officers" language to the purchase agreement and continuing through the requests for a separately executed covenant and the discussion of its importance at the closing, the record bears repeated evidence of the independent significance placed by the Shahs on this covenant. Mr. Shah even testified that he would not have gone through with the sale absent such an agreement. Hence, petitioners' covenant was in fact a critical and separately bargained-for component of the transaction. When faced with the unusual scenario of a bank trustee selling a child care center, the Shahs prudently sought some form of assurance from the founder, operators, and true threat of competition.

In contrast, an allocation of price to the covenant entered by the trust would lack economic reality. As an officer of the bank testified, the bank lacked the expertise and credentials to open a competing child care center. Moreover, such a move would likely be otherwise precluded by the bank's fiduciary duties as trustee, thus making the agreement superfluous. Finally, no facts indicate that the Shahs placed significance on or separately bargained for a promise from the trust.

Therefore, of the two potential covenants to which consideration could be allocated, it appears that only an apportionment to petitioners' agreement would have a basis in economic reality. It is also to be noted that whether an agreement is enforceable under State law is not necessarily determinative of tax consequences when the record shows that the buyer in fact bargained and paid for a covenant. See Standard Lumber & Hardware Co. v. Commissioner, T.C. Memo. 1958-159. When faced with a situation where the Commissioner attempted to disallow a buyer's deductions taken for payments attributed to a covenant not to compete, on grounds that the covenant would be void under State law, this Court responded:

> The Commissioner argues that an oral agreement not to compete for 5 years would be void in Colorado. The Commissioner cites no authority for his contention that the deduction would not be allowable if the agreement could not be enforced. * * * The fact is that a large sum was actually paid on this arm's-length agreement and the evidence indicates that the agreement was carried out. [Id.]

Consequently, we need not reach the parties' contentions here regarding the enforceability of a covenant against petitioners. In unusual circumstances, such as those present in this case, seeking even an unenforceable agreement made in good faith may be consistent with prudent business practice. This is particularly true where, as here, the issue of enforceability is debatable and arguments exist to support both sides. Furthermore, since the Shahs apparently assumed that petitioners were bound by their signatures, it is also reasonable to believe that the Shahs in fact bargained and paid for petitioners' promise. We therefore conclude that petitioners have failed to carry their burden of establishing that an allocation of any value to their covenant not to compete would be devoid of economic reality.

### Amount of Allocation

Where, as here, an allocation of some value has been found to comport with economic reality in a general sense, the final question necessary to resolve a deficiency issue asks what specific amount of the consideration paid should be allocated to the subject agreement. We note that the amount allocated to a covenant by a taxpayer is not always controlling for tax purposes. See Lemery v. Commissioner, 52 T.C. 367, 375 (1969), affd. 451 F.2d 173 (9th Cir. 1971).

In the matter at hand, closing statements apportioned $300,000, based on calculations by Mr. Shah, to a covenant not to compete.  Respondent now concedes on brief that the proper valuation is $200,000.  Petitioners have offered no evidence by which a different value may be calculated and have instead merely contended that the proper value is zero.  Although we agree with petitioners that the valuations computed by Mr. Shah and respondent are in some respects arbitrary, we have decided that allocation of some value to petitioners' agreement is appropriate and have not been given sufficient information upon which to base an alternative measurement.  We therefore sustain the deficiency based upon the $200,000 value advocated by respondent.

Penalty Issue

Section 6662(a) and (b)(2) imposes an accuracy-related penalty in the amount of 20 percent of any underpayment that is attributable to a substantial understatement of income tax.  A "substantial understatement" is defined by section 6662(d)(1) to exist where the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000.

An exception to the section 6662(a) penalty is set forth in section 6664(c)(1) and reads:  "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that

the taxpayer acted in good faith with respect to such portion."

The taxpayer bears the burden of establishing that this

reasonable cause exception is applicable, as respondent's

determination of an accuracy-related penalty is presumed correct.

See Rule 142(a).

Regulations interpreting section 6664(c) state:

The determination of whether a taxpayer acted with
reasonable cause and in good faith is made on a case-
by-case basis, taking into account all pertinent facts
and circumstances. * * * Generally, the most important
factor is the extent of the taxpayer's effort to assess
the taxpayer's proper tax liability. * * * [Sec.
1.6664-4(b)(1), Income Tax. Regs.]

Furthermore, reliance upon the advice of a tax professional

may, but does not necessarily, demonstrate reasonable cause and

good faith for purposes of avoiding the section 6662(a) penalty.

See id.; see also Freytag v. Commissioner, 89 T.C. 849, 888

(1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868

(1991).  Such reliance is not an absolute defense, but it is a

factor to be considered.  See Freytag v. Commissioner, supra at

888.  In order for this factor to be given dispositive weight,

the taxpayer claiming reliance on a tax professional must show,

at minimum, that (1) the adviser was supplied with correct

information and (2) the incorrect return was a result of the

adviser's error.  See, e.g., Ma-Tran Corp. v. Commissioner, 70

T.C. 158, 173 (1978); <u>Pessin v. Commissioner</u>, 59 T.C. 473, 489 (1972); <u>Garcia v. Commissioner</u>, T.C. Memo. 1998-203, affd. without published opinion 190 F.3d 538 (5th Cir. 1999).

Applying these principles to the instant case, we conclude that petitioners have sustained their burden of establishing reasonable cause and good faith for their failure to report income related to the Little Rascals transaction. Petitioners consulted with both their attorney, Mr. Polse, and their accountant, Mr. Kehl, regarding tax implications prior to forming the charitable remainder unitrust. Furthermore, Mr. Polse suggested and drafted the trust agreement only after being apprised by petitioners of their goals and intentions with regard to the sale of their business. In addition, petitioners signed the separate covenant document only after it had been reviewed by Mr. Kehl and modified to comply with his specifications. Petitioners were thus clearly relying on professional advisers throughout the transfer of their business, and these professionals were supplied both with subjective information such as financial goals and with objective data such as physical documentation. Finally, we note that reported decisions addressing treatment of noncompetition agreements generally involve a case-by-case analysis of intentions and offer few bright lines to guide taxpayers and tax practitioners. Given

these circumstances, we hold that petitioners acted reasonably and in good faith reliance on their advisers.  Respondent's determination of an accuracy-related penalty is denied.

<u>Decision will be entered under Rule 155</u>.