T.C. Memo. 2019-65

UNITED STATES TAX COURT

K. SLAUGHTER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13256-14.                    Filed June 4, 2019.

<u>Charles E. Hodges II</u>, <u>Lynn E. Fowler</u>, and <u>James E. Brown</u>, for petitioner.

<u>David Delduco</u>, <u>John W. Sheffield III</u>, <u>Courtney S. Bacon</u>, <u>Christopher D. Bradley</u>, and <u>Shannon E. Craft</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  The instant case involves determinations of deficiencies in self-employment taxes pursuant to section 1401(a) of $155,931 and $110,670, and section 6662(a) penalties of $31,186 and $22,134, for petitioner's tax years 2010 and 2011, respectively.  Petitioner is a successful author who during the years in

**[*2]** issue received substantial royalty income pursuant to several publishing contracts. Respondent contends that all of the payments petitioner received from her publishing contracts during 2010 and 2011 were derived from her trade or business as an author and, therefore, are subject to self-employment tax pursuant to section 1401(a).[1] Petitioner contends that only a portion of the payments is allocable to her trade or business, which she defines narrowly to include only her writing.

The central issue we must decide is how much of petitioner's income from publishing contracts is derived from her trade or business and, therefore, subject to self-employment tax.[2] If we conclude that petitioner understated the amount of her trade or business income and that there are deficiencies, we must then also decide whether the section 6662(a) and (b)(1) negligence penalty applies.

FINDINGS OF FACT

Petitioner resided in Georgia when the petition was filed. During taxable years 2010 and 2011, petitioner spent roughly 12 to 15 weeks in Georgia engaged in writing. Petitioner has worked since the 1990s to establish herself as a brand

---

[1] All section references are to the Internal Revenue Code in effect for the years in issue, and all Rules references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2] The parties settled all other matters in the notice of deficiency.

[*3] author because it was her determination that the difference between writing generally and writing for a living is branding. A brand author is one who provides prestige or reliable profits to a publishing house. When she decided to become a writer, petitioner set out in a businesslike fashion to obtain stationery, a reputable agent, and a contract with a New York publishing house. She succeeded in working with a media coach and publishers to develop her name and likeness into a successful brand. Therefore, in addition to writing, she spent time during 2010 and 2011 meeting with publishers, agents, media contacts, and others to protect and further her status as a brand author.

During the years in issue, petitioner received payments pursuant to contracts she had entered into during the years 1999 through 2011 (contracts). The contracts all provide for payments in a similar manner. The publishers agree to make two types of payments. The first is a nonrefundable advance, paid in the respective ways set forth in the contracts. The second is a royalty, or a portion of the revenue or profits generated by the sales of petitioner's manuscripts.[3] The

---

[3] A third type of payment, which the parties did not address in detail, is bonuses tied to the sale numbers of the contracted-for books and adaptations of petitioner's books into movies. Petitioner entered into separate contracts for the manufacture and sale of audio versions of her books. Those contracts follow a pattern similar to the book contracts, in which the publisher agrees to pay petitioner royalties from the sales, rentals, downloads, and sublicensing of the

(continued...)

**[*4]** contracts specify the royalty rates applied to the revenue or profits from the works; only the amounts in excess of the advance amounts are paid as royalties.

The contracting publishers receive more than just the right to print, publish, distribute, sell, and license the works and manuscripts written, or to be written, by petitioner. They also secure the right to use her name and likeness in advertising, promotion, and publicity for the contracted works. Petitioner is required to provide photos and be available for promotional activities. The contracts include noncompete clauses which vary in scope, from requiring that the specified manuscript be completed before others, to prohibiting petitioner's entry into another contract until her writing obligations are met. Publishers also secure the right to advertise other works in petitioner's books, qualified by the requirement that petitioner consent to the specific advertisements. Several of the contracts allow for, but do not require, a share of advertising proceeds to be paid to petitioner as a condition of her consent. Finally, the contracts include an exclusive option for the respective publisher to negotiate the contract for petitioner's next works.

---

[3](...continued)
audio versions of her books.

**[\*5]** Petitioner also receives more than just her advances and royalties. For instance, some contracts include a marketing guaranty requiring the publisher to spend a minimum amount on marketing for petitioner's books. Although the publishers fund the marketing plan, petitioner's agent retains the authority over its development. Another example is petitioner's option to purchase the publisher's plates at a reduced cost for any book that goes out of print and that the publisher refuses to reissue or license. In that instance, the rights in the work also revert to petitioner.

The various requirements of the contracts and the additional benefits described above appear to be standard in the publishing industry. It is not standard, however, to assign a particular value to such rights and benefits in the contracts. Petitioner's contracts are no exception; they do not allocate the advances or royalties between writing the works, promoting the works, noncompete clauses, or exclusive options.

On her Federal income tax returns for 2010 and 2011 petitioner deducted as a business expense the cost of leasing a vehicle to attend media interviews and promotional events. She also deducted the cost of hosting her own promotional events. Not all of petitioner's meetings and events were within driving distance of Atlanta, however. For marketing purposes, many of her meetings were scheduled

**[*6]** in New York City. While there, petitioner often attended meetings, conducted media interviews, and participated in publishing industry events such as trade shows. During the years in issue petitioner also met with a fellow writer to collaborate on a script for a possible television series. To facilitate her various activities, petitioner rented an apartment in New York City and deducted the rent on her 2010 and 2011 returns (NYC apartment). Petitioner also deducted the cost of business gifts to agents, editors, publishers, and others.

Petitioner's promotional activities and writing have created a very successful brand and body of work. In petitioner's case, her brand includes her name and likeness as well as her reputation, goodwill, and existing readership. Book buyers walk into book stores and request petitioner's books using her name rather than the title. Petitioner has developed good relationships with booksellers and librarians, which help to sell her books. She also maintains contact with her readership through social media, websites, and a newsletter.

Petitioner was not a brand author when she signed her first contract in 1999. By the time she entered into her contract in 2007, she had become a brand author and her typical advance had grown eightfold. Today, petitioner spends the same amount of time writing a book as she did in 1999. The change in income is due to petitioner's cachet as a brand author, i.e., her ability to attract and engage readers,

[*7] speak in front of a crowd, and recommend other authors within her publishing house. Petitioner's name is valuable to her publisher because it is how book buyers identify her books. Because petitioner sells books and is able to entice people into book stores, she fits into her publishers' business "like a jewel in the[ir] crown." In short, publishers now pay more for petitioner's work because of her brand.

To prepare her 2010 and 2011 returns, petitioner turned to the same tax preparation firm she has worked with for approximately 20 years. Several people from the firm, including Karen Wesley, a certified public accountant, worked together to prepare petitioner's 2010 and 2011 returns. Ms. Wesley has been licensed since 1989, prepares roughly 300 tax returns per year, and has worked with petitioner for approximately eight years. In order to prepare the returns, petitioner first met with a bookkeeper and then with Ms. Wesley to review questions and ensure that the firm had everything it needed. For each return, the firm worked as a team and addressed any followup issues with petitioner on the phone. After finalizing the return, petitioner reviewed it with Steve Harless, the paid preparer who signed the return.

Over the course of working with petitioner and talking with petitioner's agent, it became apparent to Ms. Wesley that petitioner was compensated for more

[*8] than simply writing.  Ms. Wesley came to understand that an author's earned income is generally the amount paid for actually writing but that petitioner's income was higher because she was also paid for her name and likeness.  Ms. Wesley concluded that any amount paid to petitioner for the use of her name and likeness was "investment income", i.e., payment for an intangible asset beyond that of her trade or business as an author.  Ms. Wesley noted the distinction between investment income and income generated from writing because, in her opinion, only the latter would give rise to self-employment tax.  Ms. Wesley therefore concluded that petitioner should pay self-employment tax only on the amount that publishers pay her for writing and not on amounts paid for her name and likeness.

Although the preparers conducted research to determine the income allocable to petitioner's trade or business, they found no definitive authority in the particular instance of a brand author's income.  They decided to report all of the advances and royalties petitioner received on a Schedule E, Supplemental Income and Loss, subtract the portion relating to the trade or business of writing, and report that amount on a Schedule C, Profit or Loss From Business.  The Schedule C amount, therefore, represents the team's calculation of petitioner's trade or business income.  The preparers calculated the amount of petitioner's self-

[*9] employment tax due using only the Schedule C income amount; they did not calculate any self-employment tax due from the balance of the advances and royalties left on Schedule E.

The accounting team did not have copies of petitioner's publishing contracts. To calculate the amount reported on petitioner's Schedule C, the preparers used a calendar-based approach. They applied the percentage of the year which petitioner spent writing to the total payments she received for the year. Petitioner did not provide the preparers with a work calendar. Instead, the preparers relied on petitioner's statement that it took her roughly 12 to 15 weeks to produce a manuscript for a publisher. The preparers applied a 12-week period and assumed a five-day workweek because petitioner told them she occasionally took time off from writing. For the 2011 tax year the percentage reported was higher than that for 2010 because petitioner spent more time writing.

No other adviser recommended apportioning the income in the foregoing manner, and no appraiser was employed to value petitioner's contracts or opine on the calendar-based approach. The only individuals outside the accounting firm with whom the team discussed their conclusions were petitioner and her agent. The preparers shared with petitioner the plan to split the income; explained that it was based on a conclusion that some of petitioner's income from the publishing

[*10] contracts was not related to her trade or business of writing; and discussed their computations, which were based on the percentage of petitioner's time spent writing. Petitioner was a longtime client of the accounting firm, and she relied on their conclusions and judgment to prepare accurate returns. The preparers told petitioner that they did not find authority for treating the income in the manner they suggested but advised her that the allocation on the returns was proper. The firm's preparers did not provide any written advice to petitioner as to the treatment of her income on the returns. They did not believe such treatment was an aggressive return position; they considered it reasonable.

OPINION

We must decide what portion of petitioner's income from publishing contracts is derived from her trade or business and, therefore, subject to self-employment tax pursuant to section 1401(a). We have jurisdiction over petitioner's timely filed petition. See secs. 6211(a), 6213(a); Philbin v. Commissioner, 26 T.C. 1159 (1956); sec. 1.1401-1(a), Income Tax Regs. We decide this case on the preponderance of the evidence. See Knudsen v. Commissioner, 131 T.C. 185, 189 (2008), supplementing T.C. Memo 2007-340.

Section 1401(a) imposes a tax on the self-employment income of every individual. Section 1402(b) defines "self-employment income" as "net earnings

[*11] from self-employment". Section 1402(a) defines "net earnings from self-employment" in pertinent part as "the gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by this subtitle which are attributable to such trade or business". The term "derived", in turn, requires "a nexus between the income received and a trade or business that is, or was, actually carried on. * * * [T]here [must] be some trade or business activity by the taxpayer which gives rise to the income". Newberry v. Commissioner, 76 T.C. 441, 444 (1981).

The definition of trade or business must be construed broadly and requires an examination of all the facts and circumstances. Commissioner v. Groetzinger, 480 U.S. 23, 31 (1987); Hornaday v. Commissioner, 81 T.C. 830, 834, 836-837 (1983). Generally, when used in reference to self-employment income, the term "trade or business" has the same meaning as it does in section 162. Sec. 1402(c). To be engaged in a trade or business within the meaning of section 162, and by extension section 1402, an individual must be involved in an activity with continuity and regularity, and the primary purpose for engaging in the activity must be for income and profit. See Commissioner v. Groetzinger, 480 U.S. at 35.

In summary, for income to be subject to self-employment tax, a taxpayer must be engaged in a trade or business and the income must derive from that trade

[*12] or business.  See secs. 1401(a), 1402(a) and (b).  The dispute we must resolve in this case is whether there is a distinction, for self-employment tax purposes, between petitioner's royalty income derived from her writing and any royalty income derived from her name and likeness.  Petitioner contends that one portion of her royalty payments is derived from her writing, which is a trade or business, and that another portion is derived, not from her writing, but rather solely from her name and likeness--personal attributes which are not part of any trade or business.

Respondent contends that there is a sufficient nexus between the royalties paid to petitioner and her trade or business of writing such that all of her income from publishing contracts is subject to self-employment tax.  Respondent relies upon several cases in which we concluded that the taxpayers, who were authors, owed self-employment tax on all of their royalty income.  See Dacey v. Commissioner, T.C. Memo. 1992-187; Hittleman v. Commissioner, T.C. Memo. 1990-325, aff'd, 945 F.2d 409 (9th Cir. 1991); Allen v. Commissioner, T.C. Memo. 1982-93, aff'd, 707 F.2d 522 (11th Cir. 1983); see also Rev. Rul. 68-498, 1968-2 C.B. 377; Rev. Rul. 55-385, 1955-1 C.B. 100.  None of the taxpayer-authors in the foregoing cases and revenue rulings cited by respondent, however, contended that the royalty payments should be allocated between the trade or

[*13] business of writing and an intangible asset. Petitioner is not challenging her deficiency on the basis of allowable expenses, see Allen v. Commissioner, T.C. Memo. 1982-93, attempting to shift her royalty income by donating her copyrights to a nonprofit entity of her own creation, see Hittleman v. Commissioner, T.C. Memo. 1990-325, or contending that her writing activity is a hobby, see Dacey v. Commissioner, T.C. Memo. 1992-187; Rev. Rul. 68-498, supra.[4] None of the authorities cited by respondent establishes that income derived from an author's brand provides a sufficient nexus to her trade or business of writing so as to be subject to self-employment tax.

Respondent contends that this Court and others have limited the application of the nexus test, both explicitly and implicitly, to cases with a particular set of distinguishable facts: when taxpayers receive payments in lieu of engaging in their trade or business, meaning that the payments are separate and distinct from the taxpayer's trade or business and that they are made precisely for not engaging

---

[4] We are not bound by revenue rulings, and we evaluate them on the basis of the "power to persuade" standard articulated by the Supreme Court in Skidmore v. Swift & Co., 323 U.S. 134, 139 (1944). See Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 208-209 (2009), aff'd, 679 F.3d 1109 (9th Cir. 2012); PSB Holdings, Inc. v. Commissioner, 129 T.C. 131, 142 (2007). Under that standard, the weight we give revenue rulings "depends upon their persuasiveness and the consistency of the Commissioner's position over time." Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. at 209.

**[\*14]** in it.  See, e.g., Peterson v. Commissioner, 827 F.3d 968 (11th Cir. 2016) (addressing whether postretirement program distributions are subject to self-employment tax), aff'g in part, dismissing in part T.C. Memo. 2013-271; Gump v. United States, 86 F.3d 1126 (Fed. Cir. 1996) (analyzing termination payments); Milligan v. Commissioner, 38 F.3d 1094, 1099-1100 (9th Cir. 1994) ("[The taxpayer] received these payments precisely because he was no longer working for State Farm."), rev'g T.C. Memo. 1992-655; Jackson v. Commissioner, 108 T.C. 130 (1997) (analyzing termination payments); Newberry v. Commissioner, 76 T.C. 441 (finding that the insurance payments in issue were made explicitly for the taxpayer's inability to work).

Petitioner contends that the payments for her brand are, contrary to respondent's contention, separate and distinct from payments for her trade or business of writing.  She furthermore contends that this is the case even when they are made by one payor and that these distinct payments are not trade or business income.  Petitioner cites Rev. Rul. 68-499, 1968-2 C.B. 421, in support of both of her contentions.  Rev. Rul. 68-499, supra, discusses a company paying royalties to certain individuals who are also employed by the company.  On the basis that the licensing contracts are separate and distinct from the employment contracts, the revenue ruling concludes that the royalties are not paid for services performed by

[*15] the individuals, that they are not "wages", and that therefore they are not subject to payroll taxes. Id.

Petitioner offered expert testimony in support of her contention that, just as with the employer in Rev. Rul. 68-499, supra, her publishers' intent was to pay one amount for her writing and another separate and distinct amount for her brand.[5]  According to petitioner's expert, the actual writing of a manuscript is but a small percentage of the value a publisher seeks from an author.  An author's work may sell on the basis of the author's name and readers' expectations for a particular kind of story, rather than for the quality of the writing.  The total contract amount is greatly influenced by several elements, such as branding, which are not spelled out on paper but are known to both parties.  Despite the existence of these other elements, petitioner's expert testified that she has always seen them valued together with the writing of the manuscript.  On the basis of this testimony, petitioner contends that the amount paid for her writing is what a publisher would pay a nonbrand author, and the excess of that amount is a separate and distinct payment for her brand.

---

[5] Petitioner's expert was not qualified or offered as an expert in valuation but rather as an expert in the publishing industry and author branding.

**[\*16]** Analogizing earned wages to net earnings, and payroll taxes to self-employment tax, petitioner contends that the conclusion in Rev. Rul. 68-499, <u>supra</u>, should be applied to her case.  Specifically, she contends that payment for the writing of a manuscript is payment for a service; wages have been defined as payments made in exchange for services, sec. 3121(b); <u>Milligan v. Commissioner</u>, 38 F.3d at 1099 n.7, and therefore, by analogy, payment for such a service should be subject to self-employment tax just as wages are subject to payroll taxes.  In contrast, payment for something other than a service, such as the licensing royalties, is not a wage, <u>see</u> <u>Jones v. Commissioner</u>, T.C. Memo. 1998-354, so the separate and distinct payment for petitioner's brand should not be subject to self-employment tax.

Respondent counters that we should disregard the parties' intent because petitioner is improperly attempting to add or vary the meaning of the contracts using inadmissible parol evidence.[6]  <u>See</u> <u>Estate of Goldberg v. Commissioner</u>, T.C.

---

[6] When a taxpayer attempts to challenge a contractual allocation, this Court generally applies the strong proof rule unless the court to which appeal would normally lie has adopted a different rule.  <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756-757 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971).  The Court of Appeals for the Eleventh Circuit, to which the instant case is appealable absent stipulation to the contrary, has adopted the rule of <u>Commissioner v. Danielson</u>, 378 F.2d 771, 775 (3d Cir. 1967), <u>vacating and remanding</u> 44 T.C. 549 (1965).  <u>See</u> <u>Peterson v. Commissioner</u>, 827 F.3d 968, 988 (11th Cir. 2016), <u>aff'g in part, dismissing in</u>

(continued...)

**[\*17]** Memo. 2010-26. Furthermore, he contends that there is no separate and distinct payment because all of petitioner's income is directly or indirectly tied to the selling of her books. If a contract provides no allocation between different elements, however, then it is ambiguous and we may analyze the mutual intent of the parties. See, e.g., Jorgl v. Commissioner, T.C. Memo. 2000-10, aff'd without published opinion, 264 F.3d 1145 (11th Cir. 2001); see also Peterson Mach. Tool, Inc. v. Commissioner, 79 T.C. 72, 82 (1982), aff'd, 54 A.F.T.R.2d 84-5407 (10th Cir. 1984). Furthermore, this Court has analyzed single royalty contracts to allocate different types of compensation for purposes of the income tax. See, e.g., Garcia v. Commissioner, 140 T.C. 141 (2013); Goosen v. Commissioner, 136 T.C. 547 (2011); Kramer v. Commissioner, 80 T.C. 768 (1983).

In this case, however, we need not analyze the contract parties' intent, because petitioner's reliance on Rev. Rul. 68-499, supra, is misplaced. Petitioner's analogy fails because it attempts to adapt out-of-context definitions of employment to the definition of trade or business income under section 1402. We are not able to focus solely on the words "net earnings" to the exclusion of the

---

[6](...continued)
part T.C. Memo. 2013-271. Taxpayers can challenge the tax consequences of an agreement only by adducing proof which would be admissible to alter its construction in an action between the contracting parties, or to show a contract's unenforceability because of mistake, undue influence, fraud, duress, et cetera. Id.

**[*18]** words "trade or business". The statute provides that "net earnings from self-employment" includes income derived from any trade or business. An allocation within petitioner's contracts is beside the point if all elements are to be allocated to a trade or business.

We conclude that petitioner's brand is part of her trade or business. We construe "trade or business" broadly, and, examining all of the facts, find that petitioner was engaged in developing her brand with continuity and regularity for the primary purpose of income and profit. See Jones v. Commissioner, T.C. Memo. 1998-354; Dacey v. Commissioner, T.C. Memo. 1992-187; Hittleman v. Commissioner, T.C. Memo. 1990-325. Petitioner set out in a businesslike fashion to obtain stationery, a reputable agent, and a publishing contract. Petitioner worked with a media coach and publishers to develop a successful brand. She has spent time, including during 2010 and 2011, meeting with publishers, agents, media contacts, and others to protect and further her status as a brand author. She attended interviews and promotional events and works to develop and maintain good relationships with booksellers and librarians. Petitioner also uses social media, websites, and a newsletter to maintain her brand with her readership. Further, it is common in the publishing industry for writers to build brands and promote their work. We have held that an author's TV and radio appearances, for

[*19] example, are evidence that a taxpayer is in the trade or business of writing rather than writing as a hobby.  See, e.g., Dacey v. Commissioner, T.C. Memo. 1992-187.

Petitioner contends that her brand could never be part of a trade or business because she is "not in the trade or business of being herself".  Furthermore, her brand is not "tied to the quantity or quality" of her writing, and therefore it has an insufficient nexus with her trade or business as an author.  We do not agree.  The fact that petitioner's brand involves personal traits such as her name and likeness does not mean that it cannot form part of her trade or business.  If petitioner's brand has commercial value, it can form part of her trade or business.

Petitioner also misapplies the nexus test.  To satisfy the nexus test, the earnings must be tied to the quantity or quality of the taxpayer's labor.  Milligan v. Commissioner, 38 F.3d at 1098.  The question is not whether petitioner's brand is tied to the quantity or quality of her writing, but rather whether the payments for her brand are tied to the quantity or quality of her efforts in developing her brand. Petitioner herself admits she has worked to develop a brand.  Royalties earned from her brand are not solely a result of her publishers' actions.  Although the publishers fund the marketing plan for petitioner's books, petitioner's agent retains the authority over its development.  Petitioner's and her agent's

**[\*20]** promotional activities and monitoring of sales information contribute to the

sale of her books. Such sales-focused work is sufficiently routine that we consider

it part of petitioner's trade or business. Petitioner's books, in turn, sell in part on

the basis of her brand strength. Petitioner's brand signals to readers what content

they can expect from her books. The loyalty of her readership base translates into

higher sales, and her high sales then enhance her brand. Petitioner's brand and her

writing combined are monetized, first, by the selling of books, and second, by

providing petitioner with the leverage to negotiate for higher advances and royalty

rates.

We note petitioner's treatment of her expenses as further evidence that

payments for her brand derive from a trade or business.[7] Petitioner deducted the

rent paid for the NYC apartment on her Schedule C, even though most of her

---

[7] Analyzing petitioner's business expenses in this manner does not
contradict the parties' stipulation, is not unfair, and is not a new matter raised by
respondent that shifts the burden of proof. See Rule 142(a). A new position taken
by the Commissioner is not necessarily a new matter if it merely clarifies or
develops the original determination and is consistent with or does not increase the
amount of deficiency. Estate of Jayne v. Commissioner, 61 T.C. 744, 748-749
(1974). The parties stipulated certain amounts petitioner was entitled to deduct as
business expenses; the parties did not stipulate that the expenses related to
petitioner's writing and not her brand. Respondent's analysis merely develops the
original determination that all of petitioner's income from publishing contracts is
trade or business income, whether it was paid for her writing or her brand, and is,
therefore, not a new matter.

[*21] writing was done in Georgia.  The apartment's main purpose was to facilitate petitioner's attendance at meetings and conferences and to make connections with agents, publishers, and booksellers.  Petitioner may have met with a screenwriter in the NYC apartment to collaborate on a script, but the fundamental benefit of having a presence in New York City was to develop her brand, not to write.  Petitioner also deducted advertising costs, the cost of a car used, in part, to attend promotional activities around Atlanta, and gifts sent to her contacts in the publishing world.  Such expenses demonstrate that petitioner's trade or business extends beyond writing to its promotion.  If such promotion and brand-related expenditures are Schedule C trade or business expenses, then the income derived from the brand to which those expenses relate is also trade or business income.  See sec. 1402(c).

We turn finally to the remaining non-trade-or-business elements petitioner contends can be found in her contracts.  Such elements include payments for the publisher's right to advertise in books published from petitioner's writing; access to her readership; the right to continue an existing series; the right to use characters from prior books published from her writing; and noncompete clauses.  Some of the elements she identified fall squarely within her trade or business.  The elements involving written series and characters are directly related to her writing

[*22] activities.  See Newberry v. Commissioner, 76 T.C. at 444.  Petitioner's readership is made up of those who enjoy petitioner's writing, therefore providing a sufficient nexus.  Without her writing there can be no books whose pages may be used for advertising.  Further, the contracts include provisions that petitioner is, upon request, entitled to proceeds from the advertising in her books.  If the contracts provide for additional and separate payment for that revenue, it follows that none of petitioner's advances or royalties are allocable to it.

The remaining element petitioner explicitly identified is the amount paid for the noncompete clauses in the contracts.  Income earned for not working is not subject to self-employment tax.  See, e.g., Milligan v. Commissioner, 38 F.3d 1094; Newberry v. Commissioner, 76 T.C. at 443.  Petitioner contends that any amount allocable to noncompete clauses should similarly not be subject to self-employment tax.  Upon review of petitioner's so-called noncompete clauses, however, we conclude that for the most part they do not prevent petitioner from contracting with others; they merely require that the contracted work be completed

**[\*23]** first.[8]  Consequently, we hold that petitioner may not exclude any amount from her trade or business income that she alleges is from noncompete clauses.

In sum, we conclude that all of the payments to petitioner pursuant to the publishing contracts are income derived from her trade or business as an author, and such income is subject to self-employment tax.

Regarding the penalties, a taxpayer may be liable for a penalty of 20% of the portion of an underpayment which is attributable to, among other things, negligence or disregard of rules or regulations.  Sec. 6662(a) and (b)(1).  The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of internal revenue laws or to exercise the due care that a reasonable and ordinarily prudent person would exercise under the circumstances.  Sec. 6662(c); Neely v. Commissioner, 85 T.C. 934, 947 (1985).  It also includes the failure to make a reasonable attempt to determine the correctness of a position that would seem to a reasonable person to be "too good to be true."  Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

---

[8] Petitioner also has provided no way to value the payments made for these clauses.  The contracts are silent as to any allocation or cost of a breach; petitioner's expert witness testified almost exclusively as to the premium paid for a brand author and not as to any other right; and applying the calendar method used by petitioner's return preparers would be nonsensical for a noncompete provision.

**[\*24]** Pursuant to section 7491(c), the Commissioner generally bears the burden

of production for any penalty, but the taxpayer bears the ultimate burden of proof.

Higbee v. Commissioner, 116 T.C. 438, 446 (2001).[9] Where the Commissioner

has met his burden of production, a taxpayer may attempt to show reasonable

cause for the underpayment. The penalty will not apply if a taxpayer reasonably

relies in good faith on a return preparer. Sec. 6664(c)(1); sec. 1.6664-4(c)(1),

Income Tax Regs. The preparer must be a competent professional with sufficient

expertise to justify reliance; the taxpayer must provide necessary and accurate

information to the preparer; and the taxpayer must actually rely in good faith on

the preparer's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C.

43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). For a taxpayer to reasonably

rely on a preparer's advice, the advice must not be based on unreasonable factual

or legal assumptions. Sec. 1.6664-4(c)(1)(i) and (ii), Income Tax Regs.

Petitioner engaged the services of several qualified professionals to prepare

her tax returns, including a certified public accountant with many decades of

experience. Petitioner provided everything requested from her, and the preparers

---

[9] Petitioner moved that the Court hold that respondent failed to meet his burden of production as to the sec. 6662(a) penalty. Because we find that petitioner had reasonable cause for her underpayment, we will deny the motion as moot.

**[\*25]** were satisfied with the information. It was reasonable for petitioner to rely on her preparers' expertise, considering that she has no background in finance, law, or tax. See United States v. Boyle, 469 U.S. 241, 251 (1985). The preparers' advice was based on an assessment of the facts of petitioner's situation and a comparison to the available authority. Accordingly, we hold that petitioner reasonably relied on the advice of her preparers and, therefore, is not liable for the negligence penalties.

To reflect the foregoing,

An appropriate order and decision will be entered for respondent as to the deficiencies and for petitioner as to the section 6662 penalties.